No. 85-181

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

WARREN E. SIBLE,

        Plaintiff and Appellant,

-vs-

LEE ENTERPRISES, INC., an Iowa Corp.;
DONALD SCHWENNESEN; and MAX SALISBURY,

        Defendants and Respondents.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Michael Keedy, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Alan J. Lerner, Bigfork, Montana

    For Respondent:

        Milodragovich, Dale & Dye; Harold V. Dye, Missoula,
Montana

Submitted on Briefs: June 12, 1986

Decided: November 25, 1986

Filed: NOV 25 1986

_____
Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

This is an appeal from the Flathead County District Court jury trial and verdict finding the respondents had not published a newspaper article with actual malice.

We reverse and remand for a new trial.

On December 29, 1982, The Missoulian published an article authored by Donald Schwennesen headlined "Ex-detective accuses Flathead County sheriff of coverup, harassment." The article concerned an allegation by a former Flathead County Sheriff's detective, Max Salisbury, that appellant, Sible, had stolen a meat smoker and covered up the investigation concerning the theft.

Numerous issues are raised in this Court but we find two to be dispositive and to require reversal. Appellant contends that the court improperly instructed the jury on duties owed by The Missoulian to appellant, Sible. Further, appellant contends that the court erred in applying the "shield law" to protect Schwennesen's notes from being discovered once he had testified as a witness. We find the appellant to be correct on both counts.

First, we must view the evidence in a light most favorable to the appellant and then determine whether the court's instructions adequately presented appellant's case to the jury. For our purposes, we assume that appellant was a public official and that the "malice" standard articulated in New York Times Co. v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, applies to the case we here review.

In summary, in viewing the evidence in a light most favorable to the appellant, The Missoulian article charged that appellant had been investigated for theft and indicated

2

that he may have misused his official position by participating in a coverup of his crime. Specifically, the article states that Max Salisbury filed a notarized statement with the Governor of Montana charging "his investigation of a theft involving a fellow officer (appellant) was covered up." The article further stated that appellant harassed Salisbury and forced him to terminate his employment.

The charges of theft concerning appellant arose as the result of a "smoker" allegedly taken from one William Eckerson. Eckerson lost his "smoker" in 1974. The "smoker" was worth between $15 and $20. Appellant did in fact have a similar "smoker", but he obtained his "smoker" in 1970. A subsequent internal investigation within the Sheriff's Department determined that appellant's "smoker" was not the one taken from Eckerson and the matter was dropped. The "smoker caper" was generally known to the Kalispell journalism community. Dan Black, managing editor of The Daily Interlake, in Kalispell, refused to publish a story because of the unreliability of the charges made by Salisbury against appellant.

Salisbury's statement regarding appellant was made during a time of political controversy. Sheriff Rierson, the incumbent Flathead County Sheriff, was engaged in a hot election contest during the fall of 1982. Salisbury was supporting Rierson's opponent. On October 6, 1982, Rierson's opponents gathered at the home of one Stevens for the purpose of developing campaign strategy. Salisbury attended this meeting. Stevens informed Salisbury during the meeting that they needed a statement from Salisbury charging appellant with stealing the "smoker" so that they could embarrass Rierson by showing appellant, who worked for Rierson, covered

3

up the investigation of his own theft. At the meeting, Stevens told Salisbury that his friend, the reporter Schwennesen, promised to write an article after the statement was prepared.

Schwennesen knew Stevens disliked Rierson's administration. Schwennesen informed Stevens that a written notarized statement was necessary for him to write a story. Schwennesen admitted he knew Salisbury's statement resulted from Stevens' encouragement and that he knew Stevens was helping Rierson's opponent. Schwennesen further knew that Stevens had assisted Salisbury in preparing the statement which provided the basis for the subject story in The Missoulian. Salisbury became very nervous about Schwennesen doing a story on the "smoker caper." One John Christian was an investigating officer on the "smoker" allegation. Salisbury asked Schwennesen to contact Christian about the truth of the charges, stating Christian would be open and honest. Both Schwennesen and his editor were aware that Salisbury was nervous about the charges and had requested Christian be contacted to confirm the truth or falsity of the allegation before an article was published.

Schwennesen promised to make an independent investigation of the truth of the charges and contact Christian before publishing an article. Despite his promise, Schwennesen eventually published the story without contacting Christian and without determining in his own mind if Salisbury's charges were true or false.

Specifically, with reference to the instructions which are hereafter discussed, Schwennesen testified that it occurred to him Salisbury might have signed a false statement. Schwennesen testified under oath that he knew

4

Christian could shed light on the charges of "theft", "coverup" and "harassment". Despite this fact, Schwennesen failed to interview Christian, although Christian was available and willing to be interviewed. Christian testified at the trial that the charges made by Salisbury were without merit and that he would have so advised Schwennesen had he been contacted by Schwennesen prior to publication.

Eckerson, the man who lost his "smoker" in 1974, attempted to dissuade Schwennesen from printing an article. Eckerson told Schwennesen the story was "garbage" which should not be published and further advised Schwennesen that The Missoulian would be sued for publishing the article. Despite Eckerson's misgivings, Schwennesen informed Eckerson that the story would be published no matter what he said.

With this evidence before the jury, although disputed, the District Judge gave the following three instructions:

### INSTRUCTION NO. 11

As a matter of law, Plaintiff is a public official, and the newspaper article in question concerned his official conduct. As such, he may not recover against either Defendant unless he proves that the newspaper article was false, unprivileged, and defamatory, and that it was published with malice, that is, with knowledge that it was false, or with a reckless disregard of the truth.

### INSTRUCTION NO. 12

The term "reckless disregard of the truth," as used in these instructions, does not mean mere negligence, or even gross negligence or wanton conduct. Rather, it means publishing an article with a high degree of awareness of its probable falsity, or that the Defendants, in fact, entertained serious doubts as to the truth of the publication.

### INSTRUCTION NO. 13

The following are examples of the types of conduct which constitute malice in publishing a statement or allegation:

1) The story was fabricated by the Defendant; or,

2) The story was the product of the Defendants' imagination; or,

3) The story was based wholly on an unverified and anonymous telephone call; or,

4) The story contains allegations that are so inherently improbable that only a reckless person would put them into circulation; or,

5) The story was published despite obvious reasons to doubt the veracity of the informant upon whom the article was based, or to doubt the accuracy of his reports.

This list is provided to aid you in determining whether malice has been shown by the evidence in this case. By providing it, the Court does not mean to suggest that the list is all-encompassing and therefore exclusive, nor does it suggest that the evidence supports or does not support the presence of any such conduct in this case.

Instruction No. 11 is taken from New York Times Co. v. Sullivan, supra. The instruction is a correct statement of the law. Instruction No. 12 is fatally defective in that it defines "reckless disregard of the truth", as used in Instruction No. 11, as being equivalent to having serious doubts about the truth of the statement. Instruction No. 13 is erroneous in that it seeks to itemize instances of malice to the exclusion of other instances which may not have occurred to the District Judge. Lists such as the one set forth in Instruction No. 13 are seldom appropriate.

The effect of Instruction No. 12 is to shield a newspaper where it knows that the source of its information is highly suspect but fails to investigate. The newspaper is shielded because it failed to investigate and find out that certain information was false, choosing rather to close its eyes and publish with no actual serious doubts about the falsity of the material. Such a rule encourages irresponsible journalism. When a newspaper has facts that

6

indicate material is highly suspect, it should, and it does, have a duty to investigate before publishing.

Instruction No. 11 correctly stated the law. A newspaper is only liable for malice where it publishes with knowledge of falsity or with a reckless disregard of the truth.

The erroneous instructions may well have influenced the outcome of this case. Schwennesen and his editor had reason to believe that Salisbury's statement was highly suspect. Schwennesen failed to interview Christian, who would have told him that the statement was without any substance or merit. The Missoulian published Salisbury's statement without fully investigating and therefore, without actually knowing the statement was false. Under the instructions of the court, the jury could have found that The Missoulian was reckless in failing to investigate but nevertheless found there was no malice because The Missoulian did not entertain serious doubts about the actual truth of the statement. Upon remand, the court will instruct upon the proper standard without embellishment.

Appellant further raises error in the District Court's ruling which applied the "shield law" to protect Schwennesen's notes. Generally, a reporter's sources are privileged. The applicable statutes are found in the "Media Confidentiality Act", §§ 26-1-901, et seq., MCA. Section 26-1-902, MCA, provides:

> (1) Without his or its consent no person, including any newspaper, magazine, press association, news agency, news service, radio station, television station, or community antenna television service or any person connected with or employed by any of these for the purpose of gathering, writing, editing, or disseminating news may be examined as to or may be required to disclose any information obtained or prepared or

7

the source of that information in any legal proceeding if the information was gathered, received, or processed in the course of his employment or its business.

(2) A person described in subsection (1) may not be adjudged in contempt by a judicial, legislative, administrative, or any other body having the power to issue subpoenas for refusing to disclose or produce the source of any information or for refusing to disclose any information obtained or prepared in gathering, receiving, or processing information in the course of his or its business.

The above-quoted statute protects a reporter's sources. Schwennesen's notes were shielded by this statute until he took the witness stand or testified by way of deposition. Section 26-1-903(2), MCA, provides:

(2) If the person claiming the privilege voluntarily offers to testify or to produce the source, with or without having been subpoenaed or ordered to testify or produce the source, before a judicial, legislative, administrative, or other body having the power to issue subpoenas or judicially enforceable orders, he or it waives the provisions of 26-1-902.

Under this provision, Schwennesen waived his privilege to keep his notes confidential. Upon retrial the notes are subject to discovery if Schwennsesen testifies.

Judgment in favor of The Missoulian is vacated. The case is remanded for a new trial in accordance with the views herein expressed.

Justice

We Concur:

Chief Justice

8

_John Conway Harrison_

_L. C. Gulbrandson._

_John C. Sheehy_
Justices

9

Mr. Justice William E. Hunt, Sr., concurring:

I concur with the majority opinion concerning the jury instructions given by the Court and I concur in the reversal of the action on that basis. However, I do not agree with the majority that the facts are as clear as they present them.

My review of the record indicates that the article contains errors and omissions, and in the final analysis proved to be false. However, the fact that the article ultimately proved to be false does not change my belief that Sible has failed to clearly and convincingly prove that the article was published with actual malice. As stated in New York Times Co. v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

> The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and belief which are offered." (Citation omitted.)

> [E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive . . ." (Citation omitted.)

376 U.S. at 271-72, 84 S.Ct. at 721, 11 L.Ed.2d at 701.

Montana is also committed to the notion that freedom of expression should be as broad and unfettered as possible recognizing such freedom must be weighed against an individual's right of privacy and reputation. 1972 Mont. Const., Art. II, § 7; Cox v. Lee Enterprises (Mont. 1986), 723 P.2d 238, 43 St.Rep. 1476.

Sible raises a number of errors and omissions in the article, but especially finds fault with respondents' failure to adequately investigate the story, and with the use of the

words "theft" and "coverup." Investigatory failures alone are insufficient to establish reckless disregard of the truth. Instead, Sible must show that the respondents' conduct was highly unreasonable and constituted "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Curtis Publishing Co. v. Butts (1967), 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111.

Here, while respondents' investigation could have been more thorough, it was not so unreasonable as to constitute an extreme departure from responsible publishing standards.

Prior to his work on this story, Schwennesen had never met Salisbury, and knew Sible only by appearance. Sible testified he did not believe Schwennesen or anyone else at The Missoulian was "out to get him." Schwennesen interviewed all the major participants involved except one, a deputy named Christian. He attempted to contact Christian twice but he was on vacation. Schwennesen did not contact Christian after he returned from vacation because by that time, Sible had admitted to Schwennesen that he had the smoker. The Missoulian also consulted with its legal counsel prior to publication.

Schwennesen testified that Salisbury appeared to be candid, forthright, and "sincerely believed what he was telling" him. Further, Schwennesen verified the majority of facts in the story. He confirmed that the smoker was missing and that Sible admitted having it in his possession. Salisbury's investigation into the matter was authorized by Sheriff Rierson who later put Sible in charge of the detective division. Salisbury's subsequent reprimand, transfer to patrol, and ultimate resignation were verifiable

facts. I do not agree that respondents' investigatory failures were so extreme as to amount to reckless disregard of the truth.

Sible argues respondents' use of the words "theft" and "coverup" in the article constitutes reckless disregard of the truth. None of the sources for the story used those words and Sible argues their use by Schwennesen amounted to fabrication and publication of a known falsehood. I do not agree.

The owner of the smoker, Eckerson, told Schwennesen that he had seen a smoker that looked like his on property he believed to be Sible's. Eckerson further testified that he thought Sible had taken his smoker, but did not want to make an issue of it. In Salisbury's notarized statement which Schwennesen read, he states that a man, Eckerson, told him Sible "stole his smokehouse." Salisbury went to Sible's residence and "located the smokehouse." Although no one used the word "theft," it was implied from the statements and interviews Schwennesen had prior to publication.

The use of the word "coverup" derived from the fact that after Sible was placed in charge of the detective division, Salisbury was reprimanded for failure to solve cases and his demeanor with female complainants. He later transferred to the patrol division and ultimately resigned.

I do not agree that respondents acted in reckless disregard of the truth in using the words "theft" and "coverup." Instead, the article was based upon interviews with the major participants and probable conclusions from verified facts.

Furthermore, I do not believe Schwennesen waived the shield law as set out in § 26-1-902, MCA, by taking the stand.

Schwennesen was named defendant in this action. He did not file a counterclaim or a cross-claim, but did take the stand in his own defense. He testified in great detail as to the circumstances involving preparation of the article. However, at no time did Schwennesen offer to introduce any portion of his notes into evidence, nor did he refer to his notes in his testimony to refresh his recollection or bolster his testimony. I cannot agree that Schwennesen ever "voluntarily offered" to produce or testify concerning the contents of his notes.

The case of Lal v. CBS, Inc. (E.D.Pa. 1982), 551 F.Supp. 364, Aff'd (1984), 726 F.2d 97 is similar. In that case, a federal district court judge held a reporter's notes privileged under Pennsylvania's shield law even though the reporter had already revealed her primary sources. In this case, Schwennesen revealed his sources and testified concerning preparation of the article. He did not voluntarily testify concerning his notes or their contents.

Section 26-1-902, MCA, was written to encourage a free and dynamic press by protecting journalists and related media personnel from compelled disclosure of sources and confidential information. It is our duty to uphold legislative intent whenever possible. Therefore, I would conclude that the District Court was correct in refusing to compel production of Schwennesen's notes.

Because I agree that the jury was not properly instructed as to actual malice, I concur with the majority in reversing and remanding for new trial.

- 13 -                     Justice