922 A.2d 1263

IN RE VERIFIED PETITION OF MICHAEL
G. VENEZIA, APPELLANT.

Argued April 3, 2006—Decided June 13, 2007.

*Ralph J. Lamparello,* argued the cause for appellant (*Chasan Leyner & Lamparello,* attorneys; *Mr. Lamparello* and *Michael D. Witt,* of counsel; *Mr. Witt* and *Cindy Nan Vogelman,* on the briefs).

*Louis Pashman,* argued the cause for respondent North Jersey Media Group (Pashman Stein, attorneys).

*Bruce S. Rosen,* argued the cause for respondent Andrew B. Glazer (*McCusker, Anselmi, Rosen, Carvelli & Walsh,* attorneys; *Mr. Rosen* and *Alicyn B. Craig,* on the briefs).

*Thomas J. Cafferty* and *Nomi I. Lowy,* submitted a brief on behalf of amici curiae, New Jersey Press Association, Newark Morning Ledger Company, d/b/a The Star–Ledger, The Associated Press, Philadelphia Newspapers, Inc., NYP Holdings, Inc. d/b/a The New York Post, ABC, Inc., Gannett Co., Inc. and The New York Times Company (*Scarinci & Hollenbeck,* attorneys).

Justice ALBIN delivered the opinion of the Court.

New Jersey's Shield Law, *N.J.S.A.* 2A:84A–21 to –21.8, also known as the newsperson's privilege, provides the news media far-

reaching protections that are equaled by few states in the nation. Under our Shield Law, a news reporter generally can refuse to disclose in a legal inquiry any information concerning a published news article. Like all privileges, however, the Shield Law is not absolute and can be waived when a reporter knowingly discloses information in circumstances unrelated to the news reporting and gathering process.

This appeal comes before us as a result of plaintiff Michael Venezia's pursuit of a defamation action against Laurence Cherchi, the former mayor of the Borough of Leonia, based on remarks attributed to Cherchi in a news article in *The Record.* On the one hand, the author of that article, Andrew Glazer, has spoken to agents of the Bergen County Prosecutor's Office and the Leonia Borough attorney about Cherchi's comments in the article. On the other, he has invoked the Shield Law in refusing to answer deposition questions that Venezia's counsel intends to ask about Cherchi's alleged defamatory remarks that were published in *The Record.* Without Glazer's testimony, Venezia has no case against Cherchi. The Law Division found that Glazer waived the privilege and ordered him to submit to the deposition. The Appellate Division disagreed and reversed. We now hold that the privilege cannot be selectively invoked. Once Glazer stepped from behind the privilege and spoke outside of the news gathering and reporting process about his conversation with Cherchi, he could not seek the refuge of the privilege to deny Venezia's attorney what he already had told others. Therefore, Venezia's attorney may ask Glazer the same questions that Glazer was willing to answer when queried by the prosecutor's investigators and the borough attorney. In addition to responding to those questions, Glazer must produce any notes that will affirm or refute whether Cherchi made the statements attributed to him in the article.

I.

The relevant facts begin in January 2004, when the Borough of Leonia terminated Michael Venezia from his position as a proba-

tionary police officer. Venezia challenged his termination, and in February 2004, he and the Borough entered into a settlement agreement resolving the matter. On December 28, 2004, *The Record*, a newspaper owned by North Jersey Media Group (NJ Media Group), published a news article disclosing that Venezia had been fired as a probationary police officer because he "had been convicted of an undisclosed crime." The article, written by Andrew Glazer, cited Mayor Laurence Cherchi as the source of that information. In the article, Glazer reported Mayor Cherchi's account of Venezia's dismissal:

> [Cherchi] and Councilman Arnold Trachtenberg, both Democrats who have bucked the county party boss, have been accused of accessing the sealed personnel files of probationary Police Officer Michael Venezia. In the file, they learned that Venezia had been convicted of an undisclosed crime, Cherchi said.
>
> So on Cherchi's first day in office almost a year ago, his new administration sent the young cop walking. Cherchi said the trouble that followed was tied to the fact that Venezia is the son of state Superior Court Judge Donald R. Venezia, who presides in Hackensack.
>
> . . . .
>
> Cherchi refused to say what he learned from Venezia's personnel file. Public records do not reveal that Venezia had been convicted of a crime. But Cherchi said that his administration found the crime serious enough to take Venezia off the police force. He said the prior administration had tried to cover up the officer's record so he could slip into the job.
>
> And Cherchi said he had consulted with the borough attorney before taking action. A memo written by the attorney ... last month advised Cherchi and the council that they were permitted to seek information about an employee's expunged criminal record.
>
> "We saw that it was our job to have the best people on the police force that we could," Cherchi said. "Once I satisfied myself that these things were true, we decided to take action so we could."
>
> [Andrew Glazer, *Leonia Mayor Says Fax Backs His Case Against Rivals*, *The Record* (Hackensack, N.J.), Dec. 28, 2004, at L–1.]

In response to that article, on January 5, 2005, Venezia served a notice of tort claim pursuant to *N.J.S.A.* 59:8–4 on Cherchi and the Borough, alleging that Venezia's reputation had been damaged by the defamatory statements made by Cherchi. The tort claim asserted that Cherchi uttered those statements knowing they were false or with reckless disregard for the truth. In a follow-up article published on January 12, *The Record* reported that Cherchi

claimed that not only was he misquoted in the earlier article, but it was his understanding that "Venezia wasn't convicted of anything." Scott Fallon, *Ex-probationary officer says he'll sue Leonia and its mayor, The Record* (Hackensack, N.J.), Jan. 12, 2005, at L–3. The article included a statement from *The Record's* managing editor that "the newspaper [stood] by the original story." *Ibid.*

Two days later, *The Record* published the following letter from Cherchi in which he denied that he made any statement to Glazer about Venezia's criminal history:

> [Your December 28 article] attributes to me the statement that the policeman of the borough of Leonia terminated earlier this year has been convicted of a crime. I did not make that statement, and as far as I know that policeman has not been convicted of a crime.
>
> I would appreciate that you publish a correction.
>
> [Laurence P. Cherchi, Editorial, *Leonia mayor and borough cop, The Record* (Hackensack, N.J.), Jan. 14, 2005.]

Beneath Cherchi's letter appeared the following: "Editor's note: The Record stands by its Dec. 28 story." *Ibid.*

Based in part on the Glazer article, Mayor Cherchi became the target of a criminal investigation conducted by the Bergen County Prosecutor's Office, which sought to determine whether Cherchi unlawfully disclosed Venezia's confidential personnel file. Pursuant to that investigation, the prosecutor's office advised Jennifer Borg, counsel for NJ Media Group, that it intended to subpoena Glazer to testify before a grand jury about the contents of his December 28 article. As a result of a "verbal agreement" between Borg and an assistant Bergen County prosecutor, *The Record* allowed Glazer to authenticate "the information published in the December 28, 2004 article" provided that the prosecutor's office refrained from enforcing the subpoena or "asking questions [of Glazer] which went beyond authentication." In a certification, Borg explained that "[b]ecause the information contained in the December 28 article had already been published and the source of the information was clearly identified in the article, *The Record* determined that authentication was a viable option in this instance

to avoid a potentially costly legal battle with the prosecutor's office."

On January 18, 2005, accompanied by Borg, Glazer appeared in the Bergen County Prosecutor's office, where he submitted to an interview under oath conducted by two county detectives. Borg, however, was not present during the interview itself. In a ten-page statement to the detectives, Glazer detailed his telephone conversation with Mayor Cherchi that led to the December 28 article and provided some general background about his news reporting responsibilities. The questioning covered in depth the genesis of the December 28 article:

Q. Let me show you a copy of an article which was printed in The Bergen Record on December 28, 2004. Do you recognize that article?

A. Yes.

Q. How do you recognize that article?

A. I'm the author of it.

Q. The information that you wrote in that article, where did you get that information?

A. Through interviews and documents.

Q. Who did you interview for that article?

A. I interviewed the Mayor Lawrence Cherchi and former Mayor Kaufman.

Q. Do you recall when these interviews took place?

A. I believe the interview with Mayor Cherchi occurred on the 27th of December and I believe the interview with Paul Kaufman happened perhaps a day earlier.

Q. That would be in 2004, correct?

A. 2004.

Q. Where did those interviews take place?

A. They were telephone interviews at my office.

Q. How did you happen to have the interviews with Mr. Cherchi and Mr. Kaufman? Did they contact you or did you contact them?

A. I believe I contacted them each.

Q. You also stated you received other information that you attributed to this article. What was that besides the interviews?

A. They were documents. I refer to in the story to facts, that I obtained. It was facts as referred to this information from former Mayor Kaufman and Judge Venezia.

Q. Who sent you those documents?

A. I will not say.

The detectives then inquired about Cherchi's disclosure of information from Venezia's file:

Q. I'm going to bring to your attention a line in the article that you wrote. Have you read that line?

A. Yes.

Q. Can you read that line into the record please?

A. "In the file they learned that Venezia had been convicted of an undisclosed crime, Cherchi said."

Q. Who gave you that information?

A. I attributed it to Cherchi. He gave it to me.

Q. Did Mr. Cherchi really give you that information without being asked a question or did you ask him a question?

A. I don't recall how I got that information, but it was the interview with him on the record that I attributed to in the story.

Q. Was Mr. Cherchi aware that the information he was giving to you was going to be written in the news article?

A. Yes, I made it clear all statements are precluded with the off the record statement or a background statement. What my sources tell me is for publication.

. . . .

Q. Just pertaining to the information in the article, was any of the information Mr. Cherchi gave you or that Mr. Kaufman provided you with, was any of that off the record or just for the conversation, not for print in the news article?

A. Everything that was published in the article was on the record.

Q. Was Mr. Cherchi and Mr. Kaufman aware of that?

A. Both of them were made aware what they were telling me was being published in the article and on the record.

The detectives also discovered that Glazer took notes of his conversation with Cherchi:

Q. Did you tape the conversation you had with Mr. Cherchi or Mr. Kaufman?

A. No, I didn't tape the conversations.

Q. Do you have any notes on your interview with Mr. Cherchi or Mr. Kaufman?

A. I have some notes from that conversation.

Q. Do you have them with you?

A. No.

Glazer also recalled that after publication of the article he had a telephone conversation with Cherchi in which Cherchi denied making the statements attributed to him. Last, Glazer told the detectives that he checked a database available to *The Record,* and it revealed that Venezia had not been convicted of a crime.

Sometime before May 5, 2005, Michael Russo, the Leonia Borough attorney, conversed with Glazer about the statements attributed to Cherchi in the December 28 article. In reference to Venezia's suit against the Borough and his conversation with Glazer, Russo wrote to the Borough's insurer:

> I subsequently discussed this matter with Andrew Glazer. He advised me that he was aware of the article and stood by what he had written in the article.
>
> I asked him if [he] agreed that the information in dispute was factually incorrect in that Michael Venezia was never convicted of a crime. I believe he confirmed that he presently agreed that the information printed regarding this issue was false although I do not believe he stated that he realized the information was false at the time he wrote the article.
>
> However, he was very definitive that he had written the article based upon the oral statements of Mayor Cherchi and he stood by his story.

On May 9, 2005, Venezia filed a verified petition in the Superior Court of New Jersey, Law Division, seeking an order permitting him to conduct a pre-litigation deposition of Glazer pursuant to *Rule* 4:11–1 and directing Glazer to produce any notes or recordings of his conversation with Cherchi. Venezia represented that through Glazer's testimony he intended to establish that Cherchi made the defamatory statements attributed to him in the article. In a responding certification, Glazer stated that he would invoke the newsperson's privilege and therefore decline to give testimony or produce the requested documents. He also noted that as of July 12, 2005, he would no longer be residing in the United States.

On June 9, 2005, the Law Division granted Venezia's petition and ordered that Glazer appear for a deposition the next day for the purpose of giving testimony and producing all documents, notes, electronic files, or recordings related to the December 28 article. The court determined that publication of the article itself and *The Record*'s later published editor's pronouncements standing by the article constituted a waiver of the Shield Law.

On June 10, 2005, in response to an emergent application by NJ Media Group, the Appellate Division granted a stay of the deposition pending appeal. Two weeks later, in an unpublished per curiam opinion, the Appellate Division vacated the Law Division's order compelling the deposition and dismissed Venezia's verified

petition. The appellate panel maintained that in the circumstances of this case the newsperson's privilege was "absolute." Relying on this Court's decisions in *In re Schuman,* 114 *N.J.* 14, 552 *A.*2d 602 (1989) and *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 445 *A.*2d 376, *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982), the panel determined that both Glazer and *The Record* had the right to assert the privilege for the purpose of protecting from disclosure "(1) notes taken in the course of interviewing individuals for the story; (2) identity of undisclosed sources consulted, whether or not actually used in the story; and (3) any other information obtained by Glazer 'in the course of pursuing his professional activities *whether or not it is disseminated.'* " (quoting *N.J.R.E.* 508(a)). Neither the Law Division's order nor the Appellate Division's opinion addressed whether Glazer's voluntary interview with the county detectives or his conversation with the Leonia Borough attorney concerning the December 28 article constituted a waiver of the privilege.

We granted Venezia's petition for certification challenging the Appellate Division's dismissal of the order compelling Glazer's deposition and the production of discovery. 185 *N.J.* 389, 886 *A.*2d 660 (2005). We also granted permission for the New Jersey Press Association, The Star–Ledger, The Associated Press, Philadelphia Newspapers, Inc., The New York Post, ABC, Inc., Gannett Co., Inc., and The New York Times Company to participate as *amici curiae.*

Between the Appellate Division opinion and our grant of certification, Venezia filed a civil action against NJ Media Group and Glazer alleging libel. Venezia later amended the complaint naming as additional defendants the Borough of Leonia and Mayor Cherchi. The amended complaint alleged a number of causes of action, including defamation, false light, and state civil rights violations against Leonia and Cherchi; breach of contract and negligent supervision against Leonia; and libel against NJ Media Group and Glazer. A second amended complaint included federal

civil rights violations against Leonia and Cherchi and false light against NJ Media Group and Glazer.[1]

## II.

### A.

New Jersey has one of the most far-reaching Shield Laws in the country, providing the "strongest possible protection" to the newsgathering and news reporting activities of the media. *See Schuman, supra,* 114 *N.J.* at 20, 552 *A.*2d 602; Laurence B. Alexander & Ellen M. Bush, *Shield Laws on Trial: State Court Interpretation of the Journalist's Statutory Privilege,* 23 *J. Legis.* 215, 222 (1997). In its present form, the Shield Law grants a reporter a privilege from disclosing not only sources, but any information obtained in the course of newsgathering, whether or not disseminated during the newsgathering or news reporting process. *N.J.S.A.* 2A:84A–21; *Schuman, supra,* 114 *N.J.* at 25, 552 *A.*2d 602. The vitality of the newsperson's privilege is not at issue in this case. The question before the Court is whether a news reporter's repeated disclosures of non-confidential information through non-privileged channels constitute a waiver of the privilege.

Venezia argues that NJ Media Group waived the privilege by affirming Glazer's story in a subsequent article and editorial note and that Glazer likewise waived the privilege by speaking about the contents of his story with investigators of the Bergen County Prosecutor's Office and the Leonia Borough attorney. Venezia contends that under the Appellate Division's decision, dissemination of information *outside* of the newsgathering or news reporting process is protected by the privilege, thus rendering the waiver section of the Shield Law a nullity. We are asked to acknowledge

---

[1] Glazer engaged new counsel to protect his individual interests. We granted his counsel's motion to file a supplemental brief and expand the record.

once again that the news reporter's privilege, like any privilege, is subject to waiver.

The news media defendants, on the other hand, submit that under *Schuman,* only the most "egregious and cavalier" disseminations on the part of a reporter, such as speaking to one's friends and family members, may be considered a waiver of the privilege. They characterize Glazer's conversations with the prosecutor's investigators and Leonia Borough attorney as newsgathering activities, reasoning that the investigators and borough attorney are potential news sources themselves who must be cultivated for future reporting opportunities. Thus, according to the news media defendants, Glazer's cooperation with the investigators and borough attorney is logically connected to the newsgathering process and does not constitute a waiver of the privilege.

### B.

The newsperson's privilege, which is codified identically in both *N.J.S.A.* 2A:84A–21 and *N.J.R.E.* 508,[2] protects a reporter from disclosing information that he has gathered in the course of his professional activities, even if disseminated, provided that the dissemination itself is part of the newsgathering or news reporting process.[3] Our discussion must begin with the broadly stated newsperson's privilege, *N.J.S.A.* 2A:84A–21, which provides:

Subject to [*Rule* 530], a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.

---

[2] For convenience's sake, we will refer only to the statutory provision, *N.J.S.A.* 2A:84A–21.

[3] Under very restrictive and defined circumstances, a criminal defendant may overcome the privilege if he shows that "the value of the material sought as it bears upon the issue of guilt or innocence outweighs the privilege against disclosure." *N.J.S.A.* 2A:84A–21.3b.

a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and

b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.

A reporter acts "in the course of pursuing his professional activities" whenever he "obtains information for the purpose of disseminating it to the public." *N.J.S.A.* 2A:84A–21a(h). For instance, the privilege covers even journalistic information picked-up at a social gathering. *See ibid.* The privilege, however, does not extend to a reporter who "intentionally conceals from the source" his professional identity or who witnesses or participates in "any act involving physical violence or property damage." *Ibid.*

 Over the years, the Legislature has expanded the breadth of the privilege and thus expressed its intent to provide the press with the greatest possible means of protecting both confidential sources and, more generally, the manner in which it gathers information. *See In re Farber,* 78 *N.J.* 259, 270, 394 *A.*2d 330, *cert. denied,* 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978). The reporter's privilege not only covers all information received during the newsgathering process, but also information that is published in a news periodical, whether or not the source is confidential. *Schuman, supra,* 114 *N.J.* at 22, 25–27, 30–31, 552 *A.*2d 602. Disclosure of information, however, by a newsperson outside of the newsgathering and news reporting process constitutes a waiver of the privilege. *Id.* at 26, 552 *A.*2d 602.

Indeed, the very first words of the Shield Law begin by explicitly stating that the newsperson's privilege is "subject" to the waiver provisions of *N.J.R.E.* 530. The waiver provisions of that evidence rule generally apply to all privileges, including attorney-client and patient-physician. *See generally* Biunno, *Current N.J. Rules of Evidence,* comment on *N.J.R.E.* 530 (2007). *N.J.R.E.* 530 provides that

[a] person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) *without coercion and with knowledge of his right or privilege, made disclosure of*

*any part of the privileged matter or consented to such a disclosure made by anyone.*

A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section. The failure of a witness to claim a right or privilege with respect to one question shall not operate as a waiver with respect to any other question.

[(emphasis added).]

The Shield Law, however, also has its own waiver provision, applicable in criminal cases, that seemingly gives more protection to the press than *N.J.R.E.* 530—the general waiver rule. *N.J.S.A.* 2A:84A–21.3b, which was added to the Shield Law by a 1979 amendment, states: "Publication shall constitute a waiver only as to the specific materials published." *See L.* 1979, *c.* 479, § 3. In *Maressa, supra,* we concluded that it was "inconceivable that the Legislature intended a broader view of waiver in civil matters, where the public interest in disclosure is less compelling." 89 *N.J.* at 195, 445 *A.*2d 376. For that reason, we found that by enacting *N.J.S.A.* 2A:84A–21.3b, the Legislature intended "to narrow the scope of waiver·in all proceedings," not just criminal proceedings. *Ibid.* Accordingly, media defendants in civil cases are accorded the same favorable waiver provision contained in *N.J.S.A.* 2A:84A–21.3b, which is applicable to criminal cases. Thus, a reporter who divulges one piece of information does not waive the general protection of the privilege with respect to all other matters covered in an article. *Ibid.* ("[P]ublication of privileged information constitutes a waiver only as to that specific information." (footnote omitted)).

█ To be sure, a reporter may lose the sweeping protections of the Shield Law if the reporter abandons the privilege by disseminating information outside of the newsgathering and news reporting process. By way of an illustration given in *Schuman, supra,* a waiver of the privilege may occur when a newsperson "communicat[es] information or sources with friends and neighbors outside the course of newsgathering activities." 114 *N.J.* at 26, 552 *A.*2d 602. Courts in other jurisdictions also have found a waiver of the newsperson's privilege when a reporter makes a disclosure in

circumstances unrelated to newsgathering or news reporting. *Pinkard v. Johnson,* 118 *F.R.D.* 517, 523 (M.D.Ala.1987) (commenting that "[a] reporter is not free to give a sworn statement to a litigant, and later invoke the qualified reporter privilege to keep this information from the Court"); *Wheeler v. Goulart,* 593 *A.*2d 173, 174–75 (D.C.1991) (holding that reporter waived privilege when she disclosed source to "two different individuals, in no way connected with her employer"); *see also In re Dan,* 80 *Misc.*2d 399, 363 *N.Y.S.*2d 493, 497 (Sup.Ct.1975) (noting in dicta that reporter's privilege waived because reporter gave statement to assistant attorney general and governmental commission regarding events he observed).

## III.

We now apply those principles to the case before us. We reaffirm that a reporter who publishes an article in a periodical does not waive the newsperson's privilege that allows him to refrain from responding to any legal inquiries about the article. As clearly established in our case law, the Shield Law protects dissemination of information in the news reporting process. In *Maressa, supra,* a New Jersey State Senator filed a defamation action against the *New Jersey Monthly* magazine and reporters over an article evaluating the performance of various legislators in which this senator was listed as among "The Worst" in the statehouse. 89 *N.J.* at 182, 445 *A.*2d 376. The article revealed several unflattering incidents involving the senator and described him as "floundering and ineffectual" and as "callous, stupid, and just plain devious." *Ibid.* The article was based "upon interviews with some 50 lobbyists, administrative officials, legislative liaisons, committee aides and Trenton journalists." *Id.* at 194, 445 *A.*2d 376. In discovery, the senator sought the sources and materials used to write the article. *Id.* at 183, 445 *A.*2d 376. The media defendants "steadfastly refused to divulge their sources and the editorial processes leading to publication of the allegedly libelous article." *Id.* at 196, 445 *A.*2d 376.

We held that unless the reporter or newspaper waives the privilege, "the Shield Law allows newspersons who are sued for libel to refuse to disclose their sources and editorial processes." *Id.* at 181–82, 445 *A.*2d 376. Because the media defendants had not waived the privilege, we denied the senator's motion to compel discovery. *Id.* at 182, 445 *A.*2d 376.[4] We recognized that some statements within the article—those that did not express opinions—might not themselves be privileged, noting that "publication of privileged information constitutes a waiver only as to that specific information." *Id.* at 195, 197, 445 *A.*2d 376. However, we clearly barred any legal inquisition of the media defendants in view of their unwavering assertion of the privilege. *Id.* at 196, 445 *A.*2d 376.

In *Schuman, supra,* we made clear that publication of an article does not constitute a waiver of a reporter's privilege to refuse to disclose " 'information obtained in the course of pursuing his professional activities,' " even if the source of the article is identified. 114 *N.J.* at 25, 552 *A.*2d 602 (emphasis omitted) (quoting *N.J.S.A.* 2A:84A–21). In that case, the *New Jersey Herald* published articles recounting telephone conversations its reporter had with a defendant charged with kidnapping and murder. *Id.* at 16, 552 *A.*2d 602. In those conversations, the defendant confessed to the brutal killing of a seventeen-year-old woman. *Id.* at 16–17, 552 *A.*2d 602. To assist in the criminal prosecution, the State subpoenaed the reporter for the sole purpose of "obtain[ing] a sworn, in-court statement establishing that [the defendant] had uttered the words quoted in the *Herald* article." *Id.* at 17–18, 552 *A.*2d 602. In determining whether the privilege applied, we ultimately made no distinction between disclosed and undisclosed sources. *Id.* at 30, 552 *A.*2d 602. After reviewing the plain language, legislative history, and fundamental purposes of the

---

4 We also soundly rejected the senator's argument that the assertion of affirmative defenses, such as truth and fair comment, in the media defendants' answers amounted to a waiver of the privilege. *Maressa, supra,* 89 *N.J.* at 194, 445 *A.*2d 376.

Shield Law, we specifically found that the reporter did not waive the newsperson's privilege by dissemination of the information through a published article, and therefore he could not be compelled to testify concerning information contained within those articles. *Id.* at 32, 552 *A.*2d 602.

With *Maressa* and *Schuman* as our guide, it is clear that the publication of Glazer's article detailing information obtained from Cherchi does not constitute a waiver of the newsperson's privilege. Acting as a reporter in the "course of pursuing his professional activities," Glazer wrote an article of what he had learned from an identified source—Mayor Cherchi. *See N.J.S.A.* 2A:84A–21a(h). The article then was "disseminated" in print in an edition of *The Record*. *See N.J.S.A.* 2A:84A–21(b). Under the Shield Law, on the basis of publication alone, Glazer could not have been compelled to testify concerning the contents of his article. Having determined that Glazer's December 28 article squarely falls within the privilege, it would be incongruous to conclude that *The Record* waived the privilege by twice affirming the accuracy of that news story in published editorial comments. Thus, the editor's comments on January 12 and 14, 2005, stating that *The Record* stood by the December 28 article, do not constitute a waiver of the privilege.

We next address whether Glazer waived the privileged when he submitted to an interview with the county investigators and spoke with the borough attorney concerning his conversations with Cherchi.

## IV.

Venezia argues that Glazer's statements to the prosecutor's investigators and the borough attorney were clearly outside the scope of his legitimate journalistic activities. Glazer and NJ Media Group respond that Glazer was engaged in a professional undertaking covered by the privilege, not "gossip with friends or family," and that as a good reporter he was exchanging information with potential sources and gaining their confidence. By that

reasoning, Glazer did not waive the newsperson's privilege because the disclosure itself was privileged. Glazer and NJ Media Group also contend that a newsperson should not be compelled to assert the privilege out of fear that by cooperating with the authorities the benefit of the privilege will be lost, particularly given that the press may wish to report potentially illegal activity "from a feeling of public responsibility."

The preeminent issue here is whether Glazer's disclosures to the investigators and the borough attorney were outside the news-gathering and news reporting process. If so, Glazer waived the privilege with respect to the specific matters disclosed. The doctrine of waiver is founded on the simple principle that once a privileged conversation or matter is voluntarily disclosed in a non-privileged setting, there is nothing left to protect. In essence, disclosure is an admission by the holder of the privilege that the specific matter once deemed confidential is no longer worthy of protection. *See* 81 *Am.Jur.*2d *Witnesses* § 282 (2004). The privilege holder is not permitted to step from behind the shield as he pleases, sallying forth one moment to make a disclosure to one person and then to seek the shield's protection from having to repeat the same disclosure to another person. A reporter cannot play peek-a-boo with the privilege.

It bears mentioning that the record in this case does not support Glazer's present position that he cooperated with the authorities simply to discharge a civic or professional responsibility or to cultivate a relationship with an existing source. Glazer had been subpoenaed to testify before the Bergen County Grand Jury that was investigating whether Mayor Cherchi had accessed Venezia's personnel file in violation of the law. NJ Media Group and the prosecutor's office reached an accommodation, agreeing that Glazer, instead of testifying before the grand jury, would submit to questioning by investigators. In a certification, Jennifer Borg, the attorney for NJ Media Group, explained the reasons why Glazer gave a statement under oath to the investigators. *The Record* had determined that "the source of the information was

clearly identified in the [December 28] article" and "that authentication was a viable option in this instance to avoid a potentially costly legal battle with the prosecutor's office." Borg did not suggest that Glazer spoke to the investigators out of some sense of civic responsibility or to cultivate a present or future source of information. Rather, *The Record* calculated that because there were no anonymous sources to be protected in Glazer's article and because the potential expense of invoking the privilege was not worth the effort, Glazer was released to authenticate the article. And yet, after Glazer authenticated his article in a ten-page fact-detailed statement,[5] the media defendants have engaged in a "costly legal battle" with Venezia, who has sought the same authentication that was freely given to the prosecutor's office.

The media defendants nowhere explain what fundamental value is served by allowing Glazer to provide information to county investigators and the borough attorney and then to deny that same information to a civil litigant by invoking the privilege. Glazer cooperated with the prosecutor who was preparing to bring criminal charges against Mayor Cherchi for improperly accessing Venezia's personnel file. Glazer also conversed with the Leonia Borough attorney who was preparing to defend the Borough from an impending lawsuit over Cherchi's alleged published remarks that Venezia had been fired as a result of a criminal conviction.[6] Glazer's assertion of the privilege deprives Venezia of the same information previously disclosed to the investigators and, to a lesser extent, the borough attorney. That information—confirming that Cherchi made the alleged defamatory remarks—is the heart of Venezia's defamation case. Because Cherchi disputes

---

[5] Importantly, because no restriction was placed on the use of Glazer's statement by the prosecutor, it presumably could have been read to the grand jury that considered whether to indict Cherchi.

[6] After Venezia filed his notice of tort claim against Cherchi and Leonia, the borough attorney discussed the matter with Glazer, who told him that he "stood by what he had written in the article," and that he based his article on Cherchi's oral statements.

having made any actionable statement, Glazer's testimony is critical to Venezia's case.[7]

Cooperation with law enforcement authorities or a municipality, most would say, is laudable, and we do not discourage that undertaking. However, Venezia submits that his civil lawsuit is equally laudable. Venezia has claimed that his good reputation was significantly impaired when Cherchi falsely informed Glazer that he was fired as a probationary police officer because of a prior criminal conviction—information published by *The Record.* Disclosures will be valued differently, depending on who is the beneficiary, and what is commendable to one may be an abomination to another. In deciding whether a reporter has waived the privilege, such value judgments are not a relevant consideration. Simply put, under the Shield Law, if the reporter makes disclosures outside of the newsgathering and news reporting process, he has waived the privilege.

We do not find support for the media defendants' contention that only "egregious and cavalier" disclosures, such as gossiping with neighbors over the backyard fence, may count as a waiver of the newsperson's privilege. We also reject the notion that even disclosures with the most tenuous and ephemeral connection to journalism should be considered privileged. We cannot accept the argument that every reporter's disclosure to another should be viewed as a bona fide attempt to curry favor with a potential future source, and therefore as a newsgathering opportunity. That farfetched argument would render the language in *N.J.S.A.* 2A:84A-21, which states that the Shield Law is "[s]ubject" to the waiver provisions of *N.J.R.E.* 530, a nullity.

---

[7] To prove that Cherchi defamed him, Venezia must first establish that Cherchi told Glazer that Venezia had been convicted of a crime. *See DeAngelis v. Hill,* 180 *N.J.* 1, 12–13, 847 *A.2d* 1261 (2004). Although Cherchi's statement was reported in the December 28 article, the article is inadmissible as hearsay. *See State v. Otis Elevator Co.,* 10 *N.J.* 504, 509, 92 *A.2d* 385 (1952); *Samuel Sheitelman, Inc. v. Hoffman,* 106 *N.J.Super.* 353, 356, 255 *A.2d* 807 (App.Div.), *certif. denied, Huber v. Bd. of Review, Div. of Employment Sec.,* 54 *N.J.* 106, 253 *A.2d* 553 (1969). Without Glazer's testimony, Venezia is unable to proceed.

Having said that, we acknowledge the dynamic and complex nature of the newsgathering process and do not intend to strip disclosures that advance that process of their privileged status. We do not suggest that a journalist's disclosure of information to a source might not be covered by the privilege. For example, a disclosure to one source for an on-the-record comment or reaction about information obtained from another source would be privileged. Here, however, Glazer did not speak with the investigators to gather information from a source, but rather to provide assistance in a prosecution.

It bears mentioning that the facts of the present case are vastly different from those in both *Maressa* and *Schuman*. In *Maressa, supra*, the media defendants asserted the privilege in a civil defamation action and refused to disclose in discovery any information about the source or editorial processes leading to the article at issue. 89 *N.J.* at 196, 445 *A*.2d 376. In *Schuman, supra*, in response to a subpoena issued by the State in a murder trial, the reporter asserted the privilege and refused to give testimony authenticating his article containing the defendant's confession. 114 *N.J.* at 16, 552 *A*.2d 602. In contrast, here Glazer voluntarily disclosed background information about his December 28 article and his conversations with Cherchi with both the prosecutor's investigators and the borough attorney. Glazer, however, refused to provide Venezia with the same information disclosed to those others and invoked the privilege to defeat Venezia's attempts to obtain discovery and depose him in an impending civil action. The Shield Law does not grant reporters the power to selectively and arbitrarily invoke the privilege after making disclosures outside the newsgathering and news reporting process.

We understand that as a result of this ruling, a journalist may be forced to decide between cooperating with the government or preserving the privilege. But the purpose of the Shield Law is not to protect journalists from having to make difficult decisions, but to safeguard their ability to maximize " 'the free flow of information' " to the public. *See In re Woodhaven Lumber*, 123

*N.J.* 481, 492, 589 *A.*2d 135 (1991) (quoting *Schuman, supra,* 114 *N.J.* at 29, 552 *A.*2d 602). After a journalist has already spoken to county investigators and the borough attorney, we fail to see how that important interest can be threatened by ordering that he give the same information to a civil litigant.

## V.

Last, in light of Glazer's waiver of the privilege, we must determine the precise scope of that waiver. Our starting point is that Glazer's waiver must be narrowly construed to conform to the overarching purposes of the Shield Law. Therefore, Glazer cannot be compelled to answer questions or provide documents on matters not previously disclosed by him to the investigators or borough attorney. That follows because the general waiver provision of *N.J.R.E.* 530 provides that "[t]he failure of a witness to claim a right or privilege with respect to one question shall not operate as a waiver with respect to any other question." Similarly, in *Maressa, supra,* we applied the narrow waiver provision contained in *N.J.S.A.* 2A:84A–21.3b to civil cases and held that "publication of privileged information constitutes a waiver only as to that specific information." 89 *N.J.* at 195, 445 *A.*2d 376.

In his interview with the investigators, Glazer provided general information about his regularly assigned newsgathering activities and more particular information about the December 28 article. With regard to that article, Glazer, in pertinent part, told the investigators that (1) he had interviewed Cherchi by telephone for the article and taken notes of that interview; (2) Cherchi told him that he had discovered in Venezia's file a document revealing that Venezia had been convicted of a crime; (3) Cherchi knew the interview was on the record; and (4) Cherchi in a subsequent conversation, after publication of the article, denied telling him that Venezia had been convicted of a crime. In speaking with the borough attorney, Glazer confirmed only that the statements attributed to Cherchi in the article were in fact made by Cherchi.

Venezia has the right to ask the same questions posed by the investigators to which Glazer provided an answer—but nothing more. Glazer has not waived the privilege to refrain from answering questions not previously posed or to keep his own counsel on matters that he did not disclose to the investigators. For instance, Glazer specifically refused to reveal to the investigators the source of other documents he relied on in researching and writing the article. In short, Glazer does not have to address any question about the December 28 article to which he has not provided a response to the investigators or borough attorney.

For that reason, we find that the trial court's order compelling Glazer to testify at a deposition and produce all documents relating to the general subject matter of the December 28 article is overly broad. Instead, Glazer must provide testimony regarding the information actually imparted in his meetings with the investigators and borough attorney. In addition, Glazer must turn over interview notes, if any, that reflect whether Cherchi made the statements attributed to him in the article.

Although Glazer did not present any interview notes to the investigators regarding the December 28 article, once waiver has occurred on a specific item of information, no reasonable distinction can be drawn between requiring a response by oral testimony or documentary evidence. It would defeat the very truth-seeking function of a trial, and be pointless, to insist that Glazer answer orally whether Cherchi told him that Venezia had a criminal conviction and yet not require Glazer to produce contemporaneous notes that will either verify or refute that part of his article. Contemporaneous notes unquestionably would be an aid in the search for truth because of the universal understanding of the distorting effect of memory. Once a witness is called to testify, he cannot hide the best available evidence. Like any witness, Glazer cannot withhold documents in his possession that bear on the truthfulness of his assertions and that are relevant to a matter in dispute. *See generally R.* 4:10–2(a). Like any witness who testifies on a particular subject, Glazer is subject to cross-examination,

and documentary evidence that will either impeach or support his assertions is relevant to the ultimate credibility determination that must be made by the trier of fact.

The relevance of the notes, if they exist, cannot be doubted. To establish that Cherchi defamed him, Venezia must show that Cherchi stated to Glazer that Venezia was convicted of a crime. *See DeAngelis v. Hill,* 180 *N.J.* 1, 12–13, 847 *A.2d* 1261 (2004) (noting that unprivileged publication of false and injurious statement concerning another is essential element of defamation). To show that Glazer and NJ Media Group libeled him, Venezia needs to prove actual malice—that the statements were published with reckless disregard for the truth. *See id.* at 13, 847 *A.2d* 1261. If the statement attributed to Cherchi in the December 28 article is not reflected in Glazer's notes, Venezia might argue that the absence of corroboration for Glazer's assertion tends to prove that the reporter acted recklessly. The presence or absence in Glazer's interview notes of any writings reflecting what Cherchi told Glazer would therefore be directly relevant to Venezia's defamation and libel claims.[8]

While it is true that Venezia would have had no right to any discovery from Glazer had the reporter remained silent, *see Maressa, supra,* 89 *N.J.* at 200–01, 445 *A.2d* 376, after Glazer waived the privilege and made himself a witness, his credibility is subject to the same tests applied to any other witness. *See Sible v. Lee Enters., Inc.,* 224 *Mont.* 163, 729 *P.2d* 1271, 1274–75 (1986) (holding that once reporter testified he "waived his privilege to keep his notes confidential" under Montana's Shield Law), *cert. denied,* 483 *U.S.* 1011, 107 *S.Ct.* 3242, 97 *L.Ed.2d* 747 (1987); *cf. Dooley v. Boyle,* 140 *Misc.2d* 171, 531 *N.Y.S.2d* 158, 161 (Sup.Ct. 1988) (balancing interests of reporter and litigants and ordering reporter to turn over notes "which directly memorialize conversa-

---

[8] If Glazer were to use his interview notes to refresh his recollection prior to testifying, the court in its discretion may grant Cherchi, the adverse party, the right to inspect the notes and use them in cross-examination. *See N.J.R.E.* 612.

tions she had with [her sources] and which resulted directly in statements attributed to these individuals in published articles" after she testified that articles accurately reported what sources had said).

Our decision simply follows settled law that requires a privilege holder to produce documents when the privilege has been waived by the disclosure of confidential communications. *See Weingarten v. Weingarten*, 234 *N.J.Super.* 318, 326–31, 560 *A.*2d 1243 (App. Div.1989) (requiring attorney to be deposed and produce documents after client waived attorney-client privilege); *see also Weil v. Inv./Indicators Research & Mgmt., Inc.*, 647 *F.*2d 18, 23–25 (9th Cir.1981) (finding that when corporate agent testified at deposition about corporate advice received from counsel, attorney-client privilege was waived, requiring client to respond to discovery requests); *Smith v. Alyeska Pipeline Serv. Co.*, 538 *F.Supp.* 977, 979, 982 (D.Del.1982) (ordering client to turn over documents once deemed privileged because of waiver of attorney-client privilege), *aff'd o.b.*, 758 *F.*2d 668 (Fed.Cir.1984), *cert. denied*, 471 *U.S.* 1066, 105 *S.Ct.* 2142, 85 *L.Ed.*2d 499 (1985); *cf. State v. Guido*, 40 *N.J.* 191, 200–01, 205–07, 191 *A.*2d 45 (1963) (stating that once defense psychiatric expert testified in criminal case, attorney-client privilege no longer protects prior report of expert contradicting his testimony).

We recognize that Glazer's notes may contain both privileged and prior-disclosed (waived) information. If that is the case, the notes will have to be redacted before they are produced in discovery. Because of the sensitive nature of a reporter's notes—which in some instances may reveal confidential sources—we must take a measured approach to the task of redaction. Accordingly, in the first instance, Glazer will have the opportunity to redact any privileged information from his notes before complying with discovery. Only if Venezia raises a legitimate claim concerning the redaction process and makes a good faith showing for the need for an *in camera* inspection will the trial court then solely review the notes and decide the issue. *See Kinsella v. Kinsella*, 150 *N.J.* 276,

301–02, 696 *A*.2d 556 (1997); *Payton v. N.J. Tpk. Auth.,* 148 *N.J.* 524, 552–53, 691 *A*.2d 321 (1997).

## VI.

New Jersey has given the press one of the most expansive privileges in the country. But a journalist may not use that privilege selectively; once a journalist discloses privileged material outside of his newsgathering and news reporting activities, he waives the privilege with respect to what he has disclosed. A reporter who has waived the privilege then is treated the same as any witness called to testify and answer legitimate discovery requests.

In accordance with this opinion, Glazer must testify at the deposition and provide any interview notes or documents that reflect whether Cherchi made the statements attributed to him in the December 28 article. Glazer may be questioned only about *specific* information that he has already disclosed; this limited inquiry is not a license to conduct a fishing expedition. If the notes contain both privileged and non-privileged information, Glazer may redact the notes to ensure that only non-privileged, waived material is disclosed. If a legitimate question is raised concerning the nature or scope of the redaction, and good cause is shown for a review of the original notes *in camera,* the court may order that the original notes be produced for *its* sole review.

The judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for proceedings consistent with this opinion.

*For reversal and remandment*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.