20 A.3d 364

TOO MUCH MEDIA, LLC, JOHN ALBRIGHT, AND CHARLES BERREBBI, PLAINTIFFS–RESPONDENTS, v. SHELLEE HALE, DEFENDANT–APPELLANT.

Argued February 8, 2011—Decided June 7, 2011.

214

*Jeffrey M. Pollock* argued the cause for appellant (*Fox Roths-child,* attorneys; *Mr. Pollock* and *Jonathan D. Weiner,* of counsel; *Mr. Pollock, Mr. Weiner, Barry J. Muller, Abbey True Harris,* and *Joseph Schramm, III,* on the briefs).

*Joel N. Kreizman* argued the cause for respondents (*Evans, Osborne and Kreizman,* attorneys).

*Bruce S. Rosen* argued the cause for amici curiae North Jersey Media Group, Inc. and New Jersey Press Association (*McCusker, Anselmi, Rosen & Carvelli,* attorneys; *Jennifer A. Borg* and *Thomas J. Cafferty,* of counsel; *Mr. Rosen* and *Kathleen A. Hirce,* on the brief).

*Ronald K. Chen,* Counsel, Rutgers Constitutional Litigation Clinic, argued the cause for amicus curiae American Civil Liberties Union of New Jersey Foundation (*Mr. Chen,* attorney; *Mr. Chen* and *Edward L. Barocas,* on the brief).

*Gayle C. Sproul* submitted a brief on behalf of amici curiae The Reporters Committee for Freedom of the Press, Gannett Co., and Society of Professional Journalists (*Levine Sullivan Koch & Schulz,* attorneys; *Ms. Sproul* and *Michael L. Berry,* on the brief).

Chief Justice RABNER delivered the opinion of the Court.

Millions of people with Internet access can disseminate information today in ways that were previously unimaginable. Against that backdrop, this case tests the scope of New Jersey's Shield Law, *N.J.S.A.* 2A:84A–21 to –21.8—a statute that allows news reporters to protect the confidentiality of sources and news or information gathered during the course of their work. Specifically, we are asked to decide whether the newsperson's privilege extends to a self-described journalist who posted comments on an Internet message board.

Defendant Shellee Hale submits that she investigates and reports on corruption in the online adult entertainment industry. Plaintiffs John Albright, Charles Berrebbi, and their company Too Much Media, LLC (TMM) produce software used in the industry. They are suing defendant for defamation and false light for comments she posted about them on an Internet message board— a virtual forum for people to upload their thoughts, opinions, and other information. Defendant, in turn, has invoked the Shield Law.

■ New Jersey's Shield Law provides broad protection to the news media and is not limited to traditional news outlets like newspapers and magazines. But to ensure that the privilege does not apply to every self-appointed newsperson, the Legislature requires that other means of disseminating news be "similar" to traditional news sources to qualify for the law's coverage. We do not find that online message boards are similar to the types of news entities listed in the statute, and do not believe that the Legislature intended to provide an absolute privilege in defamation cases to people who post comments on message boards.

We therefore affirm the Appellate Division's decision to deny defendant protection under the Shield Law. We also modify the Appellate Division's judgment to clarify how courts should assess whether the privilege applies in future cases.

I.

TMM manufactures software known as NATS, which adult entertainment websites use to keep track of access to affiliated websites and to determine what commissions are due the referring sites. *Too Much Media, LLC v. Hale,* 413 *N.J.Super.* 135, 141–42, 993 *A.*2d 845 (App.Div.2010). John Albright and Charles Berrebbi are TMM's principals. This lawsuit stems from statements defendant posted about TMM and its owners on an Internet message board called Oprano.com (Oprano).

Internet message boards are essentially online forums for conversations. They are also referred to as discussion boards, forums, and, in the Internet's earlier days, bulletin boards. *See* Erin Jansen, *NetLingo: The Internet Dictionary* 134, 254 (2002); *see also* Douglas Downing, *Dictionary of Computer and Internet Terms* 48 (10th ed. 2009) (defining online "bulletin board systems"). Early Internet bulletin boards were compared to "message board[s] at the grocery store ... [which allowed] anyone with a computer and a modem [to] 'post' messages, read those left by others, or hold direct conversations via computer." Eric C. Jensen, Comment, *An Electronic Soapbox: Computer Bulletin Boards and the First Amendment,* 39 *Fed. Comm. L.J.* 217, 217 (1987).

Today, message or discussion boards are largely run through websites and serve essentially the same purpose: "they provide a place on the Web where users may post and read announcements on topics of common interest." Jansen, *supra,* at 134; *see* Downing, *supra,* at 306 (defining "message board"). To participate, a user typically must first register with the host website by submitting an online form with a name, e-mail address, and a chosen username. Once accepted, the user simply types text into an area on the message board website and submits the message. *See* Jansen, *supra,* at 134. The unedited message then appears on the website almost instantaneously and is "usually public and visible to all users." Downing, *supra,* at 306.

Oprano, the message board that defendant used in this case, provided an online platform for people to post unfiltered comments and engage in discussions relating to the adult entertainment industry. *Too Much Media, supra,* 413 *N.J.Super.* at 143–44, 993 *A.*2d 845. As with other online message boards, comments posted on Oprano were not prescreened, and most of the content was open to anyone with Internet access. *Id.* at 144, 993 *A.*2d 845.

Defendant Hale resides in Washington State. Until 1994, she worked for Microsoft and ran a computer consulting company. *Id.* at 142, 993 *A.*2d 845. In 2007, she started a business as a certified life coach and interacted with clients using Internet-based video technology. *Ibid.* During the course of her work, defendant claims to have fallen victim to "cyber flashers" who feigned interest in her life-coaching classes so that they could expose themselves to her using web-cameras. *See ibid.* Defendant was disturbed by these incidents and complained to the online service she had been using. After getting no redress, she looked further into how technology was used to abuse women and decided to investigate what she believed was "criminal activity in the online adult entertainment industry." *Ibid.*

In October 2007, defendant created a website called Pornafia. In a press release dated February 6, 2008, defendant described Pornafia as an "information exchange" that "came about in reaction to the unprecedented levels of criminal activity now rampant within the global adult entertainment industry . . . with the aim of providing a cost free information resource for victims, potential victims, legitimate industry players, and pertinent government agencies worldwide." *Ibid.* Defendant later testified that she intended Pornafia to serve as a "bulletin board to deliver news to the public." *See ibid.* She also claimed, without support, to have hired journalists to write for Pornafia.

Pornafia, however, was "never fully launched." *Ibid.* Defendant conceded that "the front end of it"—a "news magazine"—"was still being worked on, and was not live." *Id.* at 143, 993 *A.*2d 845. Instead, the record consists of comments defendant posted on

Oprano and other sites; her pertinent posts about plaintiffs appeared on Oprano's message board, the self-described "Wall Street Journal for the online adult entertainment industry." *Id.* at 143–45, 993 *A.*2d 845.

As part of her investigation, defendant claims that she spoke with the offices of the Washington State Attorney General and her Congressman, attended six adult industry trade shows, interviewed people in the industry, collected information from porn web blogs [1], and reviewed information in the mainstream press and on message boards involved in the industry.

In late 2007, defendant's investigation focused on reports of a security breach of TMM's NATS database. *See id.* at 142, 993 *A.*2d 845. The breach potentially exposed personal information of thousands of customers who believed they had signed up anonymously for pornographic websites. *See* Keith B. Richburg, *User Data Stolen from Pornographic Web Sites, Wash. Post,* Jan. 4, 2008, at A09. At the same time, TMM was involved in unrelated litigation with a competitor, NR Media. *Too Much Media, supra,* 413 *N.J.Super.* at 144, 993 *A.*2d 845.

Defendant claims that she conducted a detailed probe of the breach, which included talking with "sources on a confidential basis." She also posted various items on Oprano's message board suggesting that TMM had threatened people who questioned its conduct and had profited from the breach.

On March 17, 2008, for example, defendant posted the following comment on Oprano:

> Consumer's personal information is fair game to every thief online[.] Read the 2much media *Nats* depositions (not yet public but copies are out there—Charles [Berrebbi] and John [Albright] may threaten your life if you report any of the specifics which makes me wonder). . .
>
> [*Ibid.*]

---

[1] A blog is "a type of personal column posted on the Internet. . . . Some blogs are like an individual's diary while others have a focused topic, such as recipes or political news." *Downing, supra,* at 58–59.

The post contains a link to Pornafia and refers to "the depths of the schemes and fraud and how the unethical and illegal use of technology has become common practice."

In a later post on Oprano, defendant wrote that "Mr. John Albright has personally contacted me to let me know he 'has not threatened anyone[,]' but I was told something different from someone who claims differently and a reliable source." *Id.* at 145, 993 *A.*2d 845. Defendant later testified that she spoke with a person who confirmed, on a confidential basis, that Albright had "threatened their life."

Some of defendant's posts suggest that TMM violated the New Jersey Identity Theft Protection Act, *N.J.S.A.* 56:8–161 to –67, and profited from the security breach. In one post, defendant wrote,

> I guess I should preface this with innocent until proven guilty but. . . .
>
> This point really concerned me. I believe it is $10,000 per violation in New Jersey. Does anyone have any idea how many consumer's [sic] processed their information through NATS. If 2 Much Media actually was aware of a security leak between them and the Billing Company why didn't anyone put out a fraud security announcement to the consumers? If this is true—How long have they been sitting on this information and doing nothing?
>
> [*Too Much Media, supra,* 413 *N.J.Super.* at 145, 993 *A.*2d 845.]

In another posting under the heading "*Re: Too Much Media v. NR Media,*" defendant said,

> Do you think there is traceable revenue on the stolen e-mail addresses from the security leak?
>
> Do you think that we will find that traffic, spam, re-directs are found on a[n] adult site owned or operated by a TMM owner/employee?
>
> Is there a potential class action law suit by customers who's [sic] email addresses were compromised and were not informed of this theft as soon as TMM became aware of it?
>
> How many customers had a[n] increase of spam or malware after signing up under a site managed by TMM and is there some relevancy connecting the two?
>
> [*Ibid.*]

Defendant claims that she posted the above information to inform the public about the misuse of technology and to facilitate debate. *Id.* at 146, 993 *A.*2d 845. She contends that her Oprano comments were "small brief parts" of articles she intended to—but

never did—publish on Pornafia. Instead, she testified that she took Pornafia offline because her life was threatened by a customer of TMM and because of the pending lawsuit.

TMM and its owners maintain that the postings were defamatory and false in that they imply that TMM engaged in fraudulent, illegal, and unethical uses of technology, engaged in threatening behavior, used NATS software to cause an influx of spam to its customers, and failed to inform customers of the security breach because TMM was making money off of it.

In response to the posts, TMM, Albright, and Berrebbi filed a complaint on June 10, 2008 against defendant Hale and unnamed John Does alleging defamation, false light, and trade libel. The trade libel count was later withdrawn.

Defendant moved to dismiss the complaint for lack of personal jurisdiction. In support of the motion, she certified, among other things, that she had "no knowledge of the residence or domicile of any of the plaintiffs." Some of defendant's earlier posts on Oprano, however, directly contradicted her sworn statement. One post, for example, said that "NATS is made by Freehold, New Jersey-based Too Much Media," and that TMM "is organized in New Jersey." Defendant eventually withdrew her motion to dismiss.

TMM sought to depose defendant during discovery, and the trial court ordered her deposition by teleconference. Defendant, in turn, moved for a protective order and asserted that she was a reporter entitled to the protections of the Shield Law. *Ibid.* The trial court ordered an evidentiary hearing to resolve the parties' dispute over the issue. The court, in part, did not rely on defendant's certification that she was a reporter because her earlier certification wrongly declared that she did not know plaintiffs were connected to New Jersey.

The evidentiary hearing was held on April 23, 2009. After considering defendant's testimony and other evidence, the trial court concluded that she did not qualify for protection under the

Shield Law. Among other reasons, the court explained in a detailed written opinion that all of defendant's comments were posted on Oprano, a forum for discussing "the business of porn," which was not "similar" to the types of "news media" listed in *N.J.S.A.* 2A:84A–21(a). Defendant's motion for reconsideration was denied.

The Appellate Division granted defendant leave to appeal from the interlocutory order and affirmed the trial court's decision. *Too Much Media, supra,* 413 *N.J.Super.* at 141, 160, 993 *A.*2d 845. Preliminarily, the panel agreed with the trial court's decision to order an evidentiary hearing because there were disputed factual issues about the privilege's applicability. *Id.* at 149, 993 *A.*2d 845 (citing *N.J.S.A.* 2A:84A–21.3(a) & (c); *N.J.R.E.* 104(a) (further citations omitted)).

While grappling with "the difficulty in defining who is a 'news-person' " in the age of the Internet, the panel observed,

[w]e read New Jersey's Shield Law to ... focus on the news process rather than the medium or mode through which the news is disseminated to the public. Thus, the statutory privilege extends to persons "engaged in, connected with or employed by," *N.J.S.A.* 2A:84A–21, any medium "similar" to one of several enumerated news entities, *N.J.S.A.* 2A:84A–21a(a), and involved in any aspect of the news process, including "gather[ing], procur[ing], transmit[ing], compil[ing], edit[ing], or dissemi-nat[ing]" regardless of the manner of dissemination, be it print, broadcast, mechan-ical, electronic or other means. *N.J.S.A.* 2A:84A–21(a).

[*Id.* at 157, 993 *A.*2d 845.]

The Appellate Division concluded that defendant did not meet that standard for various reasons: there was no "mutual under-standing or agreement of confidentiality" between defendant and her sources; she did not have "credentials or proof of affiliation with any recognized news entity" or adhere to journalistic stan-dards "such as editing, fact-checking or disclosure of conflicts of interest"; she did not produce notes of the conversations and interviews she conducted; she did not identify herself as a report-er "so as to assure [her sources] their identity would remain anonymous and confidential"; she "merely assembl[ed] the writ-ings and postings of others" and "created no independent prod-uct"; she never contacted TMM to get its side of the story; and,

citing to the trial court's finding, because "there is little evidence (other than her own self-serving statement) that [defendant] actually intended to disseminate anything newsworthy to the general public." *Id.* at 157–60, 993 *A.*2d 845.

The panel emphasized that a person need not "satisfy all the aforementioned considerations to qualify as a member of the news media," but that "in view of the totality of the evidence, defendant has exhibited *none* of the recognized qualities or characteristics traditionally associated with the news process, nor has she demonstrated an established connection or affiliation with any news entity." *Id.* at 160, 993 *A.*2d 845 (emphasis in original).

Finally, the Appellate Division rejected defendant's argument that the First Amendment provides a privilege separate and distinct from the Shield Law. *Id.* at 162, 993 *A.*2d 845. The court reasoned that New Jersey's broad statutory privilege is arguably "more protective than the qualified First Amendment privilege recognized in *Branzburg* [*v. Hayes,* 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.*2d 626 (1972) ]." *Ibid.* The panel also found that this case "does not involve an individual's right to speak anonymously" because defendant posted comments using her own name. *Id.* at 163, 993 *A.*2d 845.

We granted defendant's motion for leave to file an interlocutory appeal, *R.* 2:2–2(b), and limited review "only to those issues relating to the New Jersey Shield Law and the First Amendment of the United States Constitution." 203 *N.J.* 433, 3 *A.*3d 1224 (2010).

## II.

Defendant contends that the Appellate Division improperly rewrote the scope of the Shield Law. She raises various arguments: that the statute is extremely broad and covers members of new, non-traditional, Internet-based news media like herself; that she was connected with news media through Pornafia; that the applicability of the Shield Law depends less on how information is disseminated than on a newsperson's intent when gathering infor-

mation; that the Appellate Division required an enhanced evidentiary showing to invoke the privilege and adopted a flawed multi-factor test; that defendant satisfied her burden of showing that she was entitled to the privilege; and that she had standing to assert her source's right to anonymous speech.

TMM embraces the Appellate Division decision and maintains that defendant's self-proclaimed status as a journalist does not entitle her to protection under the Shield Law. TMM argues the following points: that Oprano does not qualify as news media under the statute; that it was proper for the trial court to conduct a preliminary hearing; and that even if defendant were entitled to the Shield Law's protection, she waived the privilege by informing others about her investigation.

We granted amicus curiae status to the following organizations: the North Jersey Media Group Inc. and the New Jersey Press Association (collectively, "NJMG"); the American Civil Liberties Union of New Jersey (ACLU); and the Reporters Committee for Freedom of the Press, Gannett Co., Inc., and the Society of Professional Journalists (collectively, the "Reporters Committee").

Though none of the amici opine on whether the Shield Law applies to defendant, they all encourage this Court to reject the criteria outlined by the Appellate Division to determine eligibility for protection under the Shield Law. They also argue that a newsperson's certification should ordinarily suffice to establish one's entitlement to the privilege; in limited cases in which an evidentiary hearing is necessary, the hearing should be narrowly circumscribed.

NJMG also contends that the Appellate Division failed to recognize that the privilege belongs to the newsperson, not the source, and that it protects newspersons from revealing information obtained from both confidential and non-confidential sources.

The ACLU, relying on federal case law, *see, e.g., von Bulow v. von Bulow,* 811 *F.*2d 136, 144 (2d Cir.), *cert. denied sub nom., Reynolds v. von Bulow,* 481 *U.S.* 1015, 107 *S.Ct.* 1891, 95 *L.Ed.*2d

498 (1987), argues that the privilege depends on a person's intent to engage in the process of newsgathering and disseminate news. The ACLU also contends that the Appellate Division placed undue emphasis on whether defendant promised her sources confidentiality, which the Shield Law does not require.

The Reporters Committee similarly argues that this Court should adopt an intent test to determine the applicability of the Shield Law. It maintains that such an approach would properly extend the privilege beyond traditional journalists and include online content providers.

### III.

### A.

This case is about the Shield Law, not freedom of speech. Defendant was free to exercise a right at the heart of our democracy by posting her thoughts online on Oprano's message board. *See Reno v. ACLU,* 521 *U.S.* 844, 870, 117 *S.Ct.* 2329, 2344, 138 *L.Ed.*2d 874, 897 (1997) (finding "no basis for qualifying the level of First Amendment scrutiny that should be applied to" Internet). To the extent that her statements related to matters of public interest or concern, the actual-malice standard would apply to evaluate the defamation claim against her. *See Senna v. Florimont,* 196 *N.J.* 469, 496–97, 958 *A.*2d 427 (2008); *see also New York Times v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964).[2] That standard reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times, supra,* 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701 (citation omitted).

---

[2] Without the benefit of full argument or briefing by the parties, the trial court concluded that TMM is not required to prove actual malice in this case. We agree with the Appellate Division that it was premature to address the issue. *Too Much Media, supra,* 413 *N.J.Super.* at 170, 993 *A.*2d 845. On remand, the trial court should apply the test set forth in *Senna, supra,* 196 *N.J.* at 496–97, 958 *A.*2d 427, to determine whether proof of actual malice is required.

■ New Jersey's Shield Law flows from the right to free expression and freedom of the press. As discussed further below, the statute promotes and protects the ability of newspersons to gather and communicate information to the public. The law thereby buttresses constitutional safeguards for gathering news.

Although none of the parties directly challenge the constitutionality of the Shield Law on First Amendment grounds, defendant and amici encourage us to interpret the statute using an "intent test." *See, e.g., von Bulow, supra,* 811 *F.*2d at 144 (holding that "individual claiming the privilege must demonstrate, through competent evidence, the intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process"). For reasons expressed below, we decline to rely solely on an intent test because that approach does not comport with the precise language of the Shield Law. But because some courts have inferred an intent test from the First Amendment, we briefly address whether the United States Constitution provides journalists greater protection than New Jersey's Shield Law. The Appellate Division found that it does not. *Too Much Media, supra,* 413 *N.J.Super.* at 162, 993 *A.*2d 845. We agree.

Federal law has no statutory equivalent to the Shield Law. The extent of the newsperson's privilege under federal law derives from the First Amendment. *See Branzburg, supra,* 408 *U.S.* at 667, 707, 92 *S.Ct.* at 2649–50, 2670, 33 *L.Ed.*2d at 631, 655. *Compare Shoen v. Shoen,* 5 *F.*3d 1289, 1292 & n. 5 (9th Cir.1993) (finding qualified privilege for journalists under *Branzburg* and listing eight other circuit courts in accord) *with In re Grand Jury Proceedings,* 810 *F.*2d 580, 584–85 (6th Cir.1987) (interpreting *Branzburg* not to provide qualified newsperson's privilege).

In *Branzburg,* the United States Supreme Court considered whether a news reporter could be compelled to testify before a grand jury. The reporter had written an article about two young drug dealers he interviewed and watched manufacture hashish. *Branzburg, supra,* 408 *U.S.* at 667–68, 92 *S.Ct.* at 2650, 33 *L.Ed.*2d

at 631–32. The reporter declined to identify them before the grand jury, relying on a reporters' privilege under state law; the state trial judge ordered him to answer the questions. *Id.* at 668, 92 *S.Ct.* at 2650, 33 *L.Ed.*2d at 632.

The Supreme Court rejected the claim of privilege citing the public's interest in effective law enforcement and the important role of grand juries. *Id.* at 690–91, 92 *S.Ct.* at 2661, 33 *L.Ed.*2d at 645. However, the Court observed that "news gathering is not without its First Amendment protections." *Id.* at 707, 92 *S.Ct.* at 2670, 33 *L.Ed.*2d at 655. It also found "merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards." *Id.* at 706, 92 *S.Ct.* at 2669, 33 *L.Ed.*2d at 654. The Court recognized that "state courts [may] . . . respond[ ] in their own way and constru[e] their own constitutions so as to recognize a news[person]'s privilege, either qualified or absolute." *Ibid.*

Justice Powell, who cast the decisive concurring vote in *Branzburg,* suggested that the First Amendment requires a "case-by-case" balancing "between freedom of the press [not to disclose information] and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710, 92 *S.Ct.* at 2671, 33 *L.Ed.*2d at 656 (Powell, J., concurring).

Six years later, in the context of a civil defamation case, the Supreme Court rejected an absolute privilege for the editorial process. *Herbert v. Lando,* 441 *U.S.* 153, 169, 99 *S.Ct.* 1635, 1645, 60 *L.Ed.*2d 115, 129 (1979). The Court explained that such a rule "would substantially enhance the burden of proving actual malice, contrary to the expectations of *New York Times,* [*Curtis Publishing Co. v.*] *Butts,* [388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094 (1967),] and similar cases." *Ibid.*

By contrast, New Jersey's Shield Law "contains no limiting language" and provides an absolute privilege to those it covers, absent any conflicting constitutional right. *Maressa v. N.J. Monthly,* 89 *N.J.* 176, 189, 193–94, 445 *A.*2d 376 (1982); *see also*

*In re Venezia,* 191 *N.J.* 259, 269, 922 *A.*2d 1263 (2007). In a defamation action, with "no overriding constitutional interest at stake," "[t]he Legislature has already balanced the interests and concluded that the newsperson's privilege shall prevail." *Maressa, supra,* 89 *N.J.* at 194, 445 *A.*2d 376.

In essence, our Legislature accepted *Branzburg's* invitation and "fashion[ed its] own standards" that fall well within, or exceed, First Amendment limits. *See Branzburg, supra,* 408 *U.S.* at 706, 92 *S.Ct.* at 2669, 33 *L.Ed.*2d at 654; *see also Maressa, supra,* 89 *N.J.* at 187, 445 *A.*2d 376 (noting Shield Law "protect[s] confidential information to the extent allowed by the United States and New Jersey Constitutions").

For that reason, no independent federal source governs this case. At issue is whether defendant can avail herself of a state statutory privilege not to identify her sources. That question turns on the meaning of New Jersey's Shield Law, to which we now turn.

### B.

Our State's Shield Law statute is among the broadest in the nation. *Venezia, supra,* 191 *N.J.* at 269, 922 *A.*2d 1263. In short, it protects "all significant news-gathering activities." *Maressa, supra,* 89 *N.J.* at 188, 445 *A.*2d 376. It covers confidential sources and editorial processes. *Id.* at 189, 445 *A.*2d 376. It also shields "notes, memoranda, rough drafts, editorial comments, sources and other [similar] information." *Resorts Int'l, Inc. v. NJM Assocs.,* 89 *N.J.* 212, 216, 445 *A.*2d 395 (1982); *see In re Woodhaven Lumber & Mill Work,* 123 *N.J.* 481, 589 *A.*2d 135 (1991) (protecting unpublished photographic materials).

Our focus in this case, though, is not on *what* the law protects. Instead, we are required to determine *whom* the Legislature intended to cloak with an absolute privilege and, in particular, whether the law's reach extends to the use of message boards like Oprano.

■ To determine legislative intent, a statute "must be read in [its] entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole." *Burnett v. Cnty. of Bergen*, 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009) (citations and internal quotation marks omitted). A statute's "words and phrases shall be read and construed within their context" and "given their generally accepted meaning." *N.J.S.A.* 1:1–1.

■ If the plain language of the statute "leads to a clear and unambiguous result, then [the] interpretive process is over." *In re Young*, 202 *N.J.* 50, 63, 995 *A.*2d 826 (2010) (citations omitted) (alteration in original). Courts look to extrinsic evidence only "if there is ambiguity in the statutory language that leads to more than one plausible interpretation." *Burnett, supra,* 198 *N.J.* at 421, 968 *A.*2d 1151 (citations and internal quotation marks omitted).

## C.

The Shield Law provides:

> Subject to [*N.J.R.E.* 530], *a person* engaged on, *engaged in, connected with,* or employed by *news media* for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.
>
> a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
>
> b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
>
> [*N.J.S.A.* 2A:84A–21 (emphasis added); *see also N.J.R.E.* 508 (codifying Shield Law into Rules of Evidence).]

"News media" is defined as "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public." *N.J.S.A.*

2A:84A–21a(a). Newspapers, magazines, and the like are specifically defined in accordance with their traditional meanings. *See N.J.S.A.* 2A:84A–21a(c)–(g). "Newspaper," for example, is defined as

> a paper that is printed and distributed ordinarily not less frequently than once a week and that contains news, articles of opinion, editorials, features, advertising, or other matter regarded as of·current interest, has a paid circulation and has been entered at a United States post office as second class matter.
> [*N.J.S.A.* 2A:84A–21a(c).]

"News" means "any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect." *N.J.S.A.* 2A:84A–21a(b).

Finally, "[i]n the course of pursuing his professional activities" is defined as "any situation, including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public, but does not include any situation in which a reporter intentionally conceals from the source the fact that he is a reporter . . . ." *N.J.S.A.* 2A:84A–21a(h).

■ The statute's language is circular, intertwining the meaning of "news media" and "news." The statute also uses broad language but nevertheless requires those seeking the privilege to have some connection to "news media." *N.J.S.A.* 2A:84A–21. Both parties accept that the plain language of the statute requires that "a person . . . [must be] engaged in [or] connected with . . . news media. . . ." *See ibid.* (Defendant maintains that she meets that test through her relationship with Pornafia.) That language does not mean that a newsperson must be employed as a journalist for a traditional newspaper or have a direct tie to an established magazine. But he or she must have some nexus, relationship, or connection to "news media" as that term is defined.

Amicus ACLU, though, parses the statute differently. It reads the following underscored language as an independent, alternative basis to assert the privilege: "a person . . . connected with, *or*

*employed by news media for the purpose of* gathering ... news."
*Ibid.* In other words, the ACLU argues that one can either be
"connected with gathering news" or "employed by news media for
the purpose of gathering news" to be eligible for the privilege, but
one need not be "connected with news media." That technical
view overlooks other aspects of the statute. For example, the
"news" being gathered, according to the law's definitional section,
must be gathered by a "person engaged in, engaged on, connected
with or employed by a news media." *N.J.S.A.* 2A:84A–21a(b).
Also, that "news" must be "procured by or obtained *while such
required relationship* is in effect." *Ibid.* (emphasis added). Thus,
even under the ACLU's reading, a person "connected with gather-
ing news" must still have some connection with news media.

It is also difficult to square the ACLU's reading with the Shield
Law's history. For example, under the 1960 version of the
statute, "*a person engaged on, connected with,* or employed by, *a
newspaper* has a privilege to refuse to disclose." *L.* 1960, *c.* 52
(emphasis added). The legislative history to the 1977 and 1979
amendments, discussed below, reveals that changes to the statute
were not intended to eliminate the required nexus to news media.
*See In re Schuman,* 114 *N.J.* 14, 21–23, 552 *A.*2d 602 (1989);
*Maressa, supra,* 89 *N.J.* at 184–88, 445 *A.*2d 376.

### D.

That overview of the statute invites several questions: whether
defendant satisfies the required nexus to "news media"; whether
she had the necessary purpose to gather news for the public; and
whether she obtained the questioned materials while pursuing
professional activities. Our focus in this case is on the first
question—the meaning of "news media."

The newsperson's privilege in New Jersey was first enacted in
1933 and protected only the "source" of information. *L.* 1933, *c.*
167. In the decades since, the Legislature has expanded the scope
of the privilege to cover the entire newsgathering process. *Vene-*

*zia, supra,* 191 *N.J.* at 271, 922 *A.*2d 1263; *Maressa, supra,* 89 *N.J.* at 188, 445 *A.*2d 376.

The statute was amended and expanded in 1960 as part of a general overhaul of the Rules of Evidence. *L.* 1960, *c.* 52. In 1977, the Legislature further expanded the law in response to In re *Bridge,* 120 *N.J.Super.* 460, 295 *A.*2d 3 (App.Div.), *certif. denied,* 62 *N.J.* 80, 299 *A.*2d 78 (1972), *cert. denied sub nom., Bridge v. New Jersey,* 410 *U.S.* 991, 93 *S.Ct.* 1500, 36 *L.Ed.*2d 189 (1973), which upheld the incarceration of a newspaper reporter for refusing to testify before a grand jury. *L.* 1977, *c.* 253; *see In re Schuman, supra,* 114 *N.J.* at 21–22, 552 *A.*2d 602. Two years later, in 1979, the Legislature amended the Shield Law to reflect this Court's decision in *In re Farber,* 78 *N.J.* 259, 270, 394 *A.*2d 330, *cert. denied sub nom., New York Times Co. v. New Jersey,* 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978), which held that criminal defendants may overcome the newsperson's privilege under certain circumstances.

Changes to the law in 1960, 1977, and 1979, of course, were made long before the Internet and the newer media it has spawned were imaginable. As part of the 1977 amendment, though, the Legislature expanded the privilege to cover all "news media," rather than "newspapers," and defined the new phrase as it appears in the act today. *See N.J.S.A.* 2A:84A–21a(a); *L.* 1977, *c.* 253; *S.* 322 (Sponsors' Statement), 197th Leg. (N.J. Oct. 5, 1977). With this amendment, the Legislature had the foresight to accommodate new electronic means of communicating news. But it linked those methods to traditional media outlets and their functional equivalents. In particular, it defined "news media" as (1) "newspapers, magazines, press associations, news agencies, wire services, radio, [and] television"—all traditional forms of gathering and disseminating news, or (2) "other *similar* ... means* of disseminating news to the general public"—whether "printed, photographic, mechanical or electronic." *N.J.S.A.* 2A:84A–21a(a) (emphasis added).

The language of the statute reveals that the Legislature did not extend the Shield Law to all people who proclaim they are journalists. Instead, the Legislature required that they have some nexus to "news media" as that term is defined in the law.

■ The existence of new technology merely broadens the possible spectrum of what the Shield Law *might* encompass—from daily print journalism, to websites like drudgereport.com, to chat rooms, personal blogs, and beyond. But those expanded formats are simply the mechanism for delivering information. Form alone does not tell us whether a particular method of dissemination qualifies as "news media" under the statute.

■ To determine who qualifies for the privilege, courts must look to the statute. To reiterate, although the Shield Law does not limit its application to traditional news sources, it specifically requires that other means of disseminating news be *"similar"* to newspapers, magazines, and the like. *See ibid.* (emphasis added). We give "similar" its ordinary, generally accepted meaning: "having characteristics in common" or being "alike in substance or essentials." *Webster's Third New Int'l Dictionary* 2120 (1981); *see also N.J.S.A.* 1:1–1.

In accordance with the plain language of the statute, reported decisions have consistently found that "news media" can include outlets not listed in the Shield Law so long as they are similar to traditional news media. *See Trump v. O'Brien,* 403 *N.J.Super.* 281, 304, 958 *A.*2d 85 (App.Div.2008); *Kinsella v. Welch,* 362 *N.J.Super.* 143, 154–55, 827 *A.*2d 325 (App.Div.2003); *In re Avila,* 206 *N.J.Super.* 61, 66, 501 *A.*2d 1018 (App.Div.1985); *In re Napp Techs., Inc.,* 338 *N.J.Super.* 176, 184–87, 768 *A.*2d 274 (Law Div.2000).

In *Avila,* for example, even though a Spanish-language tabloid did not meet the Shield Law's precise definition of a "newspaper"—because it was free and lacked the necessary postal designation, *see N.J.S.A.* 2A:84A–21a(b)—the tabloid was sufficiently "similar" to a newspaper to qualify as "news media." *Avila,*

*supra,* 206 *N.J.Super.* at 65–66, 501 *A.*2d 1018. More recently, the Appellate Division found that the author of a nonfiction book, though not expressly covered under the statute, could avail himself of the Shield Law privilege. *Trump, supra,* 403 *N.J.Super.* at 303, 958 *A.*2d 85. Beyond the print media, footage of a hospital emergency room for a reality-based television show had a sufficient nexus to "news media" to be covered. *Kinsella, supra,* 362 *N.J.Super.* at 153–55, 827 *A.*2d 325.

But the Shield Law did not protect "a public relations firm hired to manage adverse publicity." *Napp Techs., supra,* 338 *N.J.Super.* at 184, 768 *A.*2d 274. The firm was "neither part of the traditional or nontraditional news media" nor analogous to freelance news reporters. *Id.* at 186–87, 768 *A.*2d 274.

The question, then, is whether an online message board is similar to "newspapers, magazines, press associations, news agencies, wire services, radio, [or] television." *See N.J.S.A.* 2A:84A–21a(a); *Developments in the Law—The Law of Media,* 120 *Harv. L.Rev.* 990, 1002 (2007) (noting that whether news source published exclusively on Internet receives protection under state shield statutes like New Jersey's will "hinge on whether a court is willing to consider it a 'periodical,' 'magazine,' or 'journal' or, in some cases, as sufficiently similar to one of those entities"). The fact that message boards appear on the Internet does not matter to the outcome. Instead, in light of the Shield Law, we must examine what message boards are and how they operate.

E.

■■■ As described above, online message boards provide virtual, public forums for people to communicate with each other about topics of interest. *See* Downing, *supra,* at 306; Jansen, *supra,* at 134. Contributors can post comments using their own name, as defendant did when she posted on Oprano, or a pseudonym that provides relative anonymity. *See Krinsky v. Doe 6,* 159 *Cal. App.*4th 1154, 72 *Cal.Rptr.*3d 231, 237 (2008); *see also Dendrite*

*Int'l, Inc. v. Doe,* 342 *N.J.Super.* 134, 143, 775 *A.*2d 756 (App.Div. 2001).

Message boards "promote[ ] a looser, more relaxed communication style." *Krinsky, supra,* 72 *Cal.Rptr.*3d at 238. They lack "formal rules setting forth who may speak and in what manner, and with what limitations from the point of view of accuracy and reliability." Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace,* 49 *Duke L.J.* 855, 899 (2000) (internal citation omitted). By simply entering text into a ready-made block on a message board website, anyone can post views and reply to comments posted by others. *See* Downing, *supra,* at 306; Jansen, *supra,* at 134.

In essence, message boards are little more than forums for conversation. In the context of news media, posts and comments on message boards can be compared to letters to the editor. But message-board posts are actually one step removed from letters that are printed in a newspaper because letters are first reviewed and approved for publication by an editor or employee whose thought processes would be covered by the privilege. *See Gastman v. N. Jersey Newspapers Co.,* 254 *N.J.Super.* 140, 145, 603 *A.*2d 111 (App.Div.1992). Similarly, some online media outlets screen comments posted about an article and edit or delete certain posts. By contrast, defendant's comments on an online message board would resemble a pamphlet full of unfiltered, unscreened letters to the editor submitted for publication—or, in modern-day terms, unedited, unscreened comments posted by readers on NJ.com.

Those forums allow people a chance to express their thoughts about matters of interest. But they are not the functional equivalent of the types of news media outlets outlined in the Shield Law. Neither writing a letter to the editor nor posting a comment on an online message board establishes the connection with "news media" required by the statute. *N.J.S.A.* 2A:84A–21. Therefore, even under the most liberal interpretation of the statute, defendant's use of a message board to post her comments is not covered

under the Shield Law. We do not believe that the Legislature intended to provide everyone who posts a comment on Oprano or a response to an article on NJ.com an absolute reporter's privilege under the Shield Law. We cannot find support for that proposition in the words of the statute or any other statement of the Legislature's intent.

Certain online sites could satisfy the law's standards. In *O'Grady v. Superior Court*, for example, a California appellate court held under federal and state law that the reporter's privilege applied to an individual who claimed to operate an " 'online news magazine' devoted to news and information about Apple Macintosh computers and compatible software and hardware." [3] 139 *Cal. App.*4th 1423, 44 *Cal.Rptr.*3d 72, 77 (2006). The court observed that "the open and deliberate publication on a news-oriented Web site of news gathered for that purpose by the site's operators" was "conceptually indistinguishable from publishing a newspaper, and we see no theoretical basis for treating it differently." *Id.* at 100. The appellate panel pointedly contrasted the site with "the deposit of information, opinion, or fabrication by a casual visitor to an open forum such as a newsgroup, chat room, bulletin board system, or discussion group." *Ibid.*

Also, in *Blumenthal v. Drudge*, a federal district court readily assumed that Matt Drudge, the creator of "an electronic publication called the Drudge Report," 992 *F.Supp.* 44, 47 (D.D.C.1998), qualified for the reporter's privilege under the First Amendment. 186 *F.R.D.* 236, 240, 244 (D.D.C.1999). The website started as "a gossip column focusing on gossip from Hollywood and Washington, D.C.," *see Blumenthal, supra,* 992 *F.Supp.* at 47, but now contains breaking news items and links to various articles.

---

[3] California's newsperson's privilege is less expansive than New Jersey's. It applies to "[a] publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed." *Cal. Evid.Code* § 1070(a); *see also Cal. Const.* art. I § 2(b).

Though not a conventional news outlet, the Drudge Report has evolved into a forum that shares similarities to traditional media.

A single blogger might qualify for coverage under the Shield Law provided she met the statute's criteria. In that regard, defendant cites to the Pornafia website she created and claims that her posts on Oprano stemmed from articles she was preparing for Pornafia. Whether Pornafia might some day fall within the Shield Law cannot affect the analysis in this case, though, because defendant did not use Pornafia in the manner she had announced. She concedes that she never launched the news magazine portion planned for Pornafia, and all of her comments relevant to this case appeared exclusively on Oprano. Because defendant's postings on a message board do not satisfy the requirements of the Shield Law, defendant has not made out a prima facie showing that she is entitled to its protection.

F.

Defendant and amici encourage us to analyze whether the Shield Law applies to defendant using an "intent test" that several federal circuit courts have adopted to evaluate the scope of the First Amendment's qualified privilege. *See In re Madden*, 151 *F*.3d 125, 130 (3d Cir.1998); *Shoen, supra*, 5 *F*.3d at 1293–94; *von Bulow, supra*, 811 *F*.2d at 142–43. We cannot do so in light of the particular requirements of New Jersey's Shield Law.

Under the intent test, people seeking protection under the federal journalist's privilege must show "that they: 1) are engaged in investigative reporting; 2) are gathering news; and 3) possess the intent at the inception of the news-gathering process to disseminate this news to the public." *Madden, supra*, 151 *F*.3d at 131. When the Third Circuit adopted that test, it reasoned, among other things, that the "test is ... consistent with the Supreme Court's concerns that the privilege apply only to legitimate members of the press." *Id.* at 130 (citing *Lovell v. City of Griffin*, 303 *U.S.* 444, 452, 58 *S.Ct.* 666, 669, 82 *L.Ed.* 949, 953–54 (1938)).

■ If the Legislature had wanted to create an intent test alone, it could have done so. Instead, the Shield Law requires that claimants show three things: first, a connection to news media, as discussed above; second, a purpose to gather, procure, transmit, compile, edit, or disseminate news; and third, that the materials sought were obtained in the course of pursuing professional newsgathering activities. *N.J.S.A.* 2A:84A–21.3. The second prong has some similarities to the federal intent test. But proof of purpose—or intent—is not enough. The other two prongs of the statute must be met as well, in particular, the required link to news media. And unlike federal case law, the Shield Law explicitly defines "news" and "news media." *See N.J.S.A.* 2A:84A–21a.

Our analysis, therefore, cannot rest only on defendant's intent. Because she has not shown a sufficient relationship or connection to "news media" as required under the Shield Law, her intent alone cannot validate her claim of privilege.[4]

### G.

The Appellate Division made a conscientious effort to identify certain criteria that would help determine whether a person qualifies for protection under the Shield Law. Among other things, the panel considered whether defendant identified herself as a reporter and had an "understanding or agreement of confidentiality" with her sources, whether she adhered to certain journalistic "standard[s] of professional responsibility," and whether she produced investigatory notes. *Too Much Media, supra,* 413 *N.J.Super.* at 158–59, 993 *A.2d* 845. However, those criteria are not required under the statute.

■ An understanding of confidentiality is not necessary for the privilege to attach because the statute is not limited to confidential information. Instead, it protects "[t]he source" of

---

[4] Given the above analysis, we do not address TMM's additional argument that defendant's purpose was commercial because her personal lawyer also represented TMM's prime competitor.

"*any* information" as well as "*[a]ny* news or information obtained." *N.J.S.A.* 2A:84A–21(a) & (b) (emphasis added). Prior case law confirms that broad principle. *See Venezia, supra,* 191 *N.J.* at 271, 922 *A.*2d 1263 (noting privilege covers information "whether or not the source is confidential"); *Schuman, supra,* 114 *N.J.* at 30, 552 *A.*2d 602 (finding no distinction between confidential or disclosed sources); *State v. Boiardo,* 83 *N.J.* 350, 361, 416 *A.*2d 793 (1980) (noting that "every compelled production chills confidential sources" even when the information is known). Thus, the Shield Law protects information from non-confidential as well as confidential sources.

A newsperson who "intentionally conceals from the source the fact that he is a reporter" loses the benefit of the privilege. *N.J.S.A.* 2A:84A–21a(h). That provision, however, does not require newspersons to identify themselves as reporters.

 Additionally, the privilege belongs to the newsperson, not the source. *Boiardo, supra,* 83 *N.J.* at 361, 416 *A.*2d 793. It is designed to protect the news-gathering process, not a source's expectations. *See Gastman, supra,* 254 *N.J.Super.* at 146, 603 *A.*2d 111 (holding "privilege may be asserted whether or not the source of information requests or is promised anonymity").[5]

---

[5] Defendant conflates confidentiality and anonymity in advancing an alternative argument: that even if the Shield Law does not apply to her, her sources have the right of anonymous speech under the First Amendment. For support, defendant relies on *McIntyre v. Ohio Elections Commission,* 514 *U.S.* 334, 341–43, 115 *S.Ct.* 1511, 1516–17, 131 *L.Ed.*2d 426, 436–37 (1995), which affirmed "an author's decision to remain anonymous" and struck an Ohio law that prohibited the distribution of anonymous campaign literature. *See also id.* at 343 n. 6, 115 *S.Ct.* at 1517 n. 6, 131 *L.Ed.*2d at 437 n. 6 (citing *Federalist Papers* as example of anonymous speech in which James Madison, Alexander Hamilton, and John Jay wrote under pseudonym). In the case of the Internet, the question of anonymous speech arises in "John Doe" lawsuits against online critics who post anonymous comments or use a pseudonym. *See, e.g., Dendrite, supra,* 342 *N.J.Super.* 134, 775 *A.*2d 756 (establishing standards for applications to compel Internet Service Providers to identify anonymous Internet posters).

Even assuming defendant has standing to assert the rights of her sources, this is not a case about anonymous speech. Defendant's sources apparently identi-

■ Maintaining particular credentials or adhering to professional standards of journalism—like disclosing conflicts of interest or note taking—is also not required by the Shield Law. Amicus NJMG suggests that industry practices vary widely and that some characteristics highlighted by the Appellate Division are not followed. Regardless, the statute mandates a connection to "news media" and a purpose to gather or disseminate news; it does not limit the privilege to professional journalists who follow certain norms. The Legislature could have chosen that approach but did not. *Compare N.J.S.A.* 2A:84A–21 *with N.Y. Civ. Rights Law* § 79–h (applying New York's Shield Law only to "professional journalists and newscasters").

## IV.

■ The Shield Law outlines a procedure for invoking the newsperson's privilege. *See N.J.S.A.* 2A:84A–21.3. That section provides that claimants must make a prima facie showing that (1) they have the requisite connection with news media, (2) they have the necessary purpose to gather or disseminate news, and (3) the materials subpoenaed were obtained in the ordinary course of pursuing professional newsgathering activities. *N.J.S.A.* 2A:84A–21.3(a). In criminal cases, defendants can defeat the privilege by showing, among other things, that "the value of the material sought ... bears upon the issue of guilt or innocence" and "outweighs the privilege against disclosure," or that the claimant waived the privilege. *N.J.S.A.* 2A:84A–21.3(b). Waiver is narrowly construed and applies "only ... to the specific materials published." *Ibid.* Finally, paragraph (c) notes that courts shall make determinations on those issues after a hearing at which both parties may "present evidence and argument." *N.J.S.A.* 2A:84A–21.3(c).

---

fied themselves to her, allegedly with an expectation of confidentiality, and she posted public comments. The right to anonymous speech, though, involves anonymous speakers. Here, defendant is the only person who spoke, and she did so openly and publicly under her own name.

Section 21.3 was enacted in response to this Court's ruling in *Farber, supra,* 78 *N.J.* at 274, 394 *A.*2d 330, which found that a criminal defendant's right to exculpatory evidence may prevail over the newsperson's privilege. *Schuman, supra,* 114 *N.J.* at 23, 552 *A.*2d 602 (citing *L.* 1979, *c.* 479). Amici correctly note that the language in paragraph (b) pertains to criminal defendants. They also rightly maintain that, unlike in criminal matters, civil cases like this defamation action do not require courts to weigh the evidence and strike a balance between the competing constitutional rights of defendants and newspersons. *See Maressa, supra,* 89 *N.J.* at 193–94, 445 *A.*2d 376. Amici, thus, submit that section 21.3 was not intended to lead to intrusive hearings in civil cases.

This Court has previously determined that the narrow waiver principles in section 21.3 apply to civil cases.[6] *See Venezia, supra,* 191 *N.J.* at 272, 922 *A.*2d 1263; *Maressa, supra,* 89 *N.J.* at 194, 445 *A.*2d 376. The Court found that by enacting section 21.3, "the Legislature intended" to accord civil defendants "the same favorable waiver provision ... applicable to criminal cases." *Venezia, supra,* 191 *N.J.* at 272, 922 *A.*2d 1263 (citation omitted). Similarly, the Appellate Division in this case saw "no reason not to apply the ... traditional rules embodied in paragraphs (a) and (c)" to civil cases. *Too Much Media, supra,* 413 *N.J.Super.* at 149, 993 *A.*2d 845.

We agree that the procedures outlined in *N.J.S.A.* 2A:84A–21.3(a) and (c) are applicable to civil cases but caution that they must be used with care to avoid eviscerating the very privilege sought to be protected. Any hearing should focus on the three issues relevant to sustain a claim: connection to news media; purpose to gather or disseminate news; and a showing that the materials sought were obtained in the course of professional

---

[6] In light of our analysis of the statute and its application here, we need not address TMM's new argument that, even if defendant were entitled to the Shield Law's protection, she waived the privilege by informing others outside the news process about her investigation.

newsgathering activities. *N.J.S.A.* 2A:84A–21.3(a). In many instances, a certification establishing those points will suffice. Standing alone, it could constitute the presentation of "evidence" that paragraph (c) contemplates. If rebutted or materially undermined by the opposing party, however, an evidentiary hearing would likely be necessary.

In the case of a newsperson with ties to traditional news media, a straightforward certification could readily make out a prima facie showing. Ordinarily, opposing counsel would be hard-pressed to challenge a certification from a traditional newspaper or television reporter, for example.

However, self-appointed journalists or entities with little track record who claim the privilege require more scrutiny. As the Appellate Division noted, the popularity of the Internet has resulted in millions of bloggers who have no connection to traditional media. *Too Much Media, supra,* 413 *N.J.Super.* at 153–54 & n. 8, 993 *A.*2d 845. Any of them, as well as anyone with a Facebook account, could try to assert the privilege. In those cases, a more probing hearing would likely be needed to determine if the privilege applies. But even then, the three relevant standards in the statute identify what is at issue. *N.J.S.A.* 2A:84A–21.3(a). Hearings should not devolve into extensive questioning about an author's editorial, writing, or thought processes. Likewise, they should avoid exposing the privileged materials the Shield Law is designed to protect.

## V.

In evaluating the scope of the Shield Law, it is important to recall that in civil defamation and libel cases, the privilege is absolute. *Maressa, supra,* 89 *N.J.* at 189, 445 *A.*2d 376. It affords complete protection to those it covers.

The Legislature is free to expand the law's coverage as a matter of policy. In an era of ever-changing technology, with new and rapidly evolving ways of communicating, the Legislature may

choose to reconsider who is a newsperson and add new criteria to the Shield Law. We are not foreclosing that discussion today; we are simply interpreting an existing and far-reaching statute.

For the reasons set forth above, we affirm and modify the judgment of the Appellate Division and remand to the trial court for further proceedings consistent with this opinion.

*Not Participating*—Justices LONG and RIVERA–SOTO.

*For affirmance as Modified/Remandment*—Chief Justice RABNER, and Justices LaVECCHIA, ALBIN, HOENS, and Judge STERN (temporarily assigned)—5.

*Opposed*—None.